**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **WAIN ENTERPRISES, LLC D/B/A WHEELERS,** | ) | **Case No. 26-41157-pwb** |
| | ) | |
| | ) | |
| **Debtor,** | ) | |

---

**DEFAULT CLAIM**

Comes now, Garden Lakes Realty Company, LLC ("Garden Lakes"), by and through undersigned counsel, and files this Default Claim in response to the *Notice of (1) Potential Assumption and Assignment of Executory Contracts and Unexpired Leases, and (2) Proposed Cure Costs* [Doc. 63] (the "Cure Notice") filed by Wain Enterprises, LLC d/b/a Wheelers (the "Debtor"), respectfully showing this Court:

1.

Garden Lakes and the Debtor are parties to those certain commercial leases concerning real property in Floyd County, Georgia, commonly known and described as 401, 403, 405, and 499 John Davenport Drive NW, Rome, GA 30161 (collectively, the "Leased Premises") with Debtor as the tenant and Garden Lakes as landlord.

2.

Debtor has operated and continues to operate its business on the Leased Premises.

3.

The Debtor's use and occupancy of 499 John Davenport Drive NW, Rome, GA 30161 is governed by that certain Commercial Lease Agreement dated December 3, 2024, which provides for base rent amounts from Debtor to Garden Lakes in the amount of $25,405.00 due and payable by the 1st day of each month. Said lease agreement additionally provides for a late payment in the amount of $2,540.00 in the event said rental payment was not received by Garden Lakes by the 5th day of a given month. The Commercial Lease Agreement described in this paragraph is attached hereto as Exhibit "A".

4.

The Debtor's use and occupancy of 401 John Davenport Drive NW, Rome, GA 30161 is governed by that certain Commercial Lease Agreement dated October 25, 2022, which provides for base rent amounts from Debtor to Garden Lakes in the amount of $8,000.00 due and payable by the 1st day of each month. Said lease agreement additionally provides for a late payment in the amount of $500.00 in the event said rental payment was not received by

Garden Lakes by the 5th day of a given month. The Commercial Lease Agreement described in this paragraph is attached hereto as Exhibit "B".

5.

The Debtor's use and occupancy of 403 John Davenport Drive NW, Rome, GA 30161 is governed by that certain Commercial Lease Agreement dated August 15, 2022, which provides for base rent amounts from Debtor to Garden Lakes in the amount of $5,000.00 due and payable by the 1st day of each month. Said lease agreement additionally provides for a late payment in the amount of $500.00 in the event said rental payment was not received by Garden Lakes by the 5th day of a given month. The Commercial Lease Agreement described in this paragraph is attached hereto as Exhibit "C".

6.

The Debtor's use and occupancy of 405 John Davenport Drive NW, Rome, GA 30161 is governed by that certain Commercial Lease Agreement dated April 1, 2023, which provides for base rent amounts from Debtor to Garden Lakes in the amount of $800.00 due and payable by the 1st day of each month. Said lease agreement additionally provides for a late payment in the amount of $80.00 in the event said rental payment was not received by Garden

Lakes by the 5th day of a given month. The Commercial Lease Agreement described in this paragraph is attached hereto as Exhibit “D”.

7.

The Commercial Lease Agreements concerning 401, 403, and 405 John Davenport Drive NW, Rome, GA 30161 were modified by that certain Lease Amendment dated November 26, 2025. In pertinent part, said amendment combined the Commercial Lease Agreements for said properties into a single lease with a single base rent amount of $14,986. Except as specifically modified in the Lease Amendment, the terms and conditions of the previous leases, as described in paragraphs 4-6 of this Default Claim, remain unchanged, including the late penalties. The Lease Amendment described in this paragraph is attached hereto as Exhibit “E”.

8.

Debtor has consistently failed to make full and timely payments as required by the above-described agreements and presently is in default.

9.

Debtor incurred $143,514.00 in charges for its use and occupancy of 401, 403, and 405 John Davenport Drive NW for the period from December 2025 through August 2026. During that period, Garden Lakes received

payments totaling $88,762.00, leaving an unpaid balance of $54,752.00, which remains due and owing to Garden Lakes. An itemized chart further describing the nature of the unpaid balance is attached hereto as Exhibit "F".

10.

Debtor incurred $505,555.00 in charges for its use and occupancy of 499 John Davenport Drive NW for the period from February 2025 through August 2026. During that period, Garden Lakes received payments totaling $418,480.00, leaving an unpaid balance of $87,075.00, which remains due and owing to Garden Lakes. An itemized chart further describing the nature of the unpaid balance is attached hereto as Exhibit "G".

11.

The sum necessary to cure Debtor's default is $141,827.00.

12.

The Cure Notice lists a single lease which is described as 233/499 John Davenport Drive and proposes a cure amount of $80,782.00. As listed, the Cure Notice neither reflects the accurate contractual arrangement between Debtor and Garden Lakes nor lists the correct cure amount.

13.

The Cure Amount, as listed on the Cure Notice, of $80,782.00 is substantially understated by the amount of $61,045.00. Said proposed cure amount, even if tendered, would not make Garden Lakes whole.

14.

Debtor has likewise failed to provide adequate assurance that the above-described defaults will be cured or provide adequate assurance of future performance. 11 U.S.C. § 365(b).

WHEREFORE, Garden Lakes respectfully requests that the Court:

(a) Read and consider its Default Claim;

(b) Find the Cure Amount to be $141,827.00;

(c) Condition any assumption or assignment of the contracts described in this Default Claim on payment in full of the correct cure amount and compliance with 11 U.S.C. § 365(b); and

(d) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 3rd day of September, 2026.

MCRAE, SMITH, PEEK, HARMAN
& MONROE, LLP

/s/*Sterling C. Newton, III*
STERLING C. NEWTON, III
GEORGIA BAR NO. 128545

P. O. Box 29
Rome, GA 30162-0029
(706) 291-6223
tnewton@msp-lawfirm.com

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **WAIN ENTERPRISES, LLC D/B/A WHEELERS,** | ) | **Case No. 26-41157-pwb** |
| | ) | |
| | ) | |
| **Debtor,** | ) | |

---

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been filed on the Court's CM/ECF system on the 3rd day of September, 2026 and served on all parties receiving electronic notices in this proceeding. Parties may access this filing through the Court's electronic filing system. Said document was also remitted via electronic mail and overnight mail with proper postage affixed to the attorney for the Debtor at the following address:

G. Frank Nason, IV
Lamberth, Cifelli, Ellis & Nason, P.A.
6000 Lake Forrest Drive, N.W.
Suite 290
Atlanta, GA 30328
fnason@lcenlaw.com

Respectfully submitted,

MCRAE, SMITH, PEEK, HARMAN & MONROE, LLP

*/s/Sterling C. Newton, III*
STERLING C. NEWTON, III

P. O. Box 29

Rome, GA 30162-0029 GEORGIA BAR NO. 128545
(706) 291-6223
tnewton@msp-lawfirm.com

**EXHIBIT "A"**

Garden Lakes Realty Company

# COMMERCIAL LEASE AGREEMENT
## (Multi-Tenant Facilities)

Georgia REALTORS®

2024 Printing

In consideration of the mutual covenants set forth herein, this Lease (hereafter the term "Lease" and "Agreement" are used interchangeably) is entered into this date of 12/3/2024 between Garden Lakes Realty Co., (hereinafter "Landlord") and Wain Enterprises, LLC dba Wheeler's, (hereinafter "Tenant") Landlord leases to Tenant, and Tenant leases from Landlord, the Property with the following address: 499 John Davenport Drive, Rome, Georgia 30165 TAXPIN/ID# part of I13Z031 and as more particularly described in the Legal Description Paragraph below:

**Legal Description**. The legal description of the Property is attached as an exhibit hereto and incorporated herein.

1. **Term**. The initial term of this Lease shall be for 60 months beginning on the earlier of the completion of the work described in any attached Work letter or the date of 1/1/2025 ("Commencement Date"), through and including the date of December 31, 2029.

2. **Possession**. If Landlord is unable to deliver possession of Property on the Commencement Date, rent shall be abated on a daily basis until possession is granted. If possession is not granted within fourteen (14) days from the Commencement Date, Tenant may terminate this Lease in which event Landlord shall promptly refund all payments and deposits to Tenant. Landlord shall not be liable for delays in the delivery of possession to Tenant.

3. **Rent**. Tenant shall pay base rent to Landlord without demand, deduction, or setoff in advance in the sum of $25,405.00, Twenty-Five Thousand Four Hundred Five Dollars per month on the first day of each month during the term of the Lease or any renewals thereof, at the following address: Garden Lakes Realty, 2400 Garden Lakes Blvd. Rome, GA 30165 (or at such other address as may be designated from time to time by Landlord in writing). If the Commencement Date begins on the second day through the last day of any month, the rent shall be prorated for that portion of the month and shall be paid at the time of leasing Property. Tenant shall also pay additional rent as may be provided elsewhere in this Lease. Such additional rent shall be paid in the same manner as the base rent.

4. **Late Payment; Service Charge for Returned Checks.** Rent not paid in full by the fifth day of the month shall be late. Landlord shall have no obligation to accept any rent not received by the fifth of the month. If late payment is made and Landlord accepts the same, the payment must be in the form of cash, cashier's check or money order and must include an additional rent amount of $2540.00 and, if applicable, a service charge for any returned check of $100.00. Landlord reserves the right to refuse to accept personal checks from Tenant after one or more of Tenant's personal checks have been returned by the bank unpaid.

5. **Security Deposit.**

A. Security Deposit to be Held by Landlord or Broker: *[Check one. The section not marked shall not be a part of this Agreement.]*

☐ **Landlord Holding Security Deposit:**

(1) Tenant has paid to Landlord as security for Tenant's fulfillment of the conditions of this Lease a security deposit of $______, ______ Dollars in ☐ cash, ☐ money order and/or ☐ check ("Security Deposit").

(2) Landlord shall deposit the Security Deposit in Landlord's general account with Landlord retaining the interest if the account is interest bearing. Tenant acknowledges and agrees that Landlord shall have the right to use such funds for whatever purpose Landlord sees fit, and such funds will not be segregated or set apart in any manner.

(3) Tenant recognizes and accepts the risk of depositing the Security Deposit with Landlord. Tenant acknowledges that Tenant has not relied upon the advise of any Broker in deciding to pay such Security Deposit to Landlord. Landlord and Tenant acknowledge and agree that:

(a) Broker has no responsibility for, or control over, any Security Deposit deposited with Landlord;
(b) Broker has no ability or obligation to insure that the Security Deposit is properly applied or deposited;
(c) The disposition of the Security Deposit is the sole responsibility of Landlord and Tenant as herein provided; and
(d) Landlord and Tenant agree to indemnify and hold harmless Broker and Broker's affiliated licensees against all claims, damages, losses, expenses or liability arising from the handling of the Security Deposit by Landlord.

WB JM

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Mark Brewster IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2024 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS TransactionDesk Edition

(4) Landlord shall return Security Deposit to Tenant, after deducting any sum which Tenant owes Landlord hereunder, or any sum which Landlord may expend to repair arising out of or related to Tenant's occupancy hereunder, abandonment of Property or default in this Lease (provided Landlord attempts to mitigate such actual damages), including but not limited to any repair, replacement, cleaning or painting of Property reasonably necessary due to the negligence, carelessness, accident, or abuse of Tenant or Tenant's employees, agents, invitees, guests, or licensees. In the event Landlord elects to retain any part of the Security Deposit, Landlord shall promptly provide Tenant with a written statement setting forth the reasons for the retention of any portion of the Security Deposit, including the damages for which any portion of the Security Deposit is retained. The use and application of the Security Deposit by Landlord shall be at the discretion of the Landlord. Appropriation by Landlord of all or part of the Security Deposit shall not be an exclusive remedy for Landlord, but shall be cumulative, and in addition to all remedies of Landlord at law or under this Lease. The Tenant may not apply the Security Deposit to any rent payment.

☐ **Broker Holding Security Deposit:**

(1) Tenant has paid to Broker as security for Tenant's fulfillment of the conditions of this Lease ("Security Deposit") $__________, ____________________ Dollars in ☐ cash, ☐ money order and/or ☒ check.

(2) The Broker shall deposit the Security Deposit in Broker's escrow/trust account (with Broker retaining the interest if the account is interest bearing) within five (5) banking days from the Binding Agreement Date.

(3) Broker shall disburse the Security Deposit only as follows: (a) upon the failure of the parties to enter into a binding lease; (b) upon a subsequent written agreement signed by all parties having an interest in the funds; (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the security deposit; (d) upon a reasonable interpretation of this Agreement by Broker; (e) as provided in the General Provisions section below of this Paragraph; or (f) upon the termination of the agency relationship between Landlord and Broker, in which event Broker shall only disburse the Security Deposit, to another licensed Georgia Real Estate Broker selected by Landlord unless otherwise agreed to in writing by Landlord and Tenant after notice to Broker and Tenant. Prior to disbursing the Security Deposit pursuant to a reasonable interpretation of this Agreement; Broker shall give all parties fifteen (15) days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Broker prior to the end of the fifteen (15) day notice period. All objections not raised in a timely manner, shall be waived. In the event a timely objection is made, Broker shall consider the objection and shall do any or a combination of the following: (a) hold the Security Deposit for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the Security Deposit and so notify all parties; and/or (c) interplead the Security Deposit into a court of competent jurisdiction. Broker shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Broker. No party shall seek damages from Broker (nor shall Broker be liable for the same) for any matter arising out of or related to the performance of Broker's duties under this Security Deposit paragraph.

B. **General Provisions Regarding Security Deposit:**

(1) In the event any Security Deposit check is not honored, for any reason, by the bank upon which it is drawn, the holder thereof shall promptly notify the other parties and Broker(s) to this Lease. Tenant shall have three (3) banking days after notice to deliver good funds to the holder. In the event Tenant does not timely deliver good funds to the holder, the Landlord shall have the right to terminate this Agreement upon written notice to the Tenant.

(2) The entire Security Deposit, if held by Landlord, will be returned to Tenant within thirty (30) days after Property is vacated if:
- (a) The term of the Lease has expired or the Lease has been terminated in writing by the mutual consent of both parties;
- (b) All monies due under this Lease by Tenant have been paid;
- (c) Property is not damaged and is left in its original condition, normal wear and tear excepted;
- (d) All keys have been returned; and
- (e) Tenant is not in default under any of the terms of this Lease.

6. **Repairs and Maintenance.** Tenant acknowledges that Tenant has inspected the Premises and that it is fit for its stated use. Tenant agrees that no representations regarding the Premises or the condition thereof and no promises to alter, decorate, improve, or repairs have been made by Landlord, Broker, or their agents unless specified in this Lease.

A. **Duties of Landlord:** Landlord shall keep the Common Areas and all major systems serving Property and/or the Common Areas in good working order and repair, normal wear and tear excepted. Upon receipt of written notice from Tenant, Landlord shall, within a reasonable time period thereafter, repair all defects in the Common Areas and those systems that are the responsibility of Landlord to maintain in good working order and repair. Landlord may change the size, use, shape, or nature of the Common Areas, so long as such change does not materially deprive Tenant of the use of Property. Landlord shall not be liable to Tenant for any damage caused by any of the above referenced systems or by water coming through or around the roof or any door, flashing, skylight, vent, window, or the like in or about Property, except if such damage is due to the gross negligence or willful misconduct of Landlord.

B. **Duties of Tenant:** Tenant agrees to maintain Property in good order and repair, normal wear and tear excepted. If Tenant does not promptly perform its maintenance and repair obligations as set forth herein, Landlord may make such repairs and/or replacements and Tenant shall promptly pay the costs of the same. Tenant shall additionally be responsible for the reasonable costs of repairs made necessary by the negligence or willful misconduct of Tenant (including Tenant's employees, agents, invitees, guests, or licensees).

7. **Common Area Costs.** *[Check one. The sections not marked shall not be a part of this Agreement.]*

☐A. **Landlord Pays All Costs:** Landlord shall pay all costs for the maintenance, repair, and operation of the Common Areas. Tenant shall be responsible for any costs caused by the intentional acts, negligence, carelessness, accident, or abuse of Tenant or Tenant's employees, agents, invitees, guests, or licensees.

Copyright© 2024 by Georgia Association of REALTORS®, Inc.

☐B. **Tenant Pays Flat Fee:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional monthly rent ______________________ Dollars ($ ____________) for Common Area maintenance, operation, and repair costs in the manner provided in the Rent Paragraph above.

☒C. **Tenant Pays Adjustable Percentage Share:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional rent Tenant's Percentage Share of the cost of maintenance, operation, and repair of the Common Areas for each calendar year of this Lease. On or before the first day of the term of this Lease, Landlord will provide Tenant written notice of Landlord's estimate of the additional rent payable under this subparagraph. During December of each calendar year or as soon as practicable, Landlord will give Tenant written notice of its estimate of the payments to be made for the ensuing calendar year. On the first day of each month during the term of the Lease, Tenant will pay one-twelfth of the estimated amount in the manner provided in the Rent Paragraph. If notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after the notice is given. Within ninety (90) days after the close of each calendar year or as soon as practicable thereafter, Landlord shall deliver to Tenant: (1) a statement the cost of maintenance, operation, and repair of the Common Areas for the calendar year certified by certified public accountants designated by Landlord; and (2) a statement of the payments made or to be made for the calendar year that has been prepared on the basis of the certified statement. If on the basis of those statements, Tenant owes an amount that is less than the estimated payments for the calendar year previously made by the Tenant, Landlord will pay Tenant the amount of the overpayment within thirty (30) days after delivery of those statements. If on the basis of those statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of those statements. If the Lease does not commence on a day other than the first day of the calendar year or ends on a day other than the last day of a calendar year, the amounts payable under this subparagraph shall be prorated.

8. **Services.** Landlord shall provide, at Landlord's expense the following services: *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*
   - ☐ General cleaning and janitorial service of the interior of Property _______ times per week
   - ☐ Concierge service as follows: ______________________________
   - ☐ Parking attendant as follows: ______________________________
   - ☐ Property monitor as follows: ______________________________
   - ☐ Trash collection service _______ times per week
   - ☐ Soap, paper towels, and toilet tissue for rest rooms ______________ times per week
   - ☐ Replacement of all light bulbs and repair and maintenance of all light fixtures located in the interior of Property.
   - ☐ Other ______________________________.

   Landlord shall not be liable for the nonperformance or inadequate performance of such services by third parties. Tenant shall be responsible for the costs and provision of any services that Landlord has not expressly agreed to pay for in this Lease. Tenant agrees to provide services not provided by Landlord that are necessary to keep Property in good order, condition, and repair, normal wear and tear excepted. If Tenant does not provide such services, Landlord may then provide such services and Tenant shall promptly pay Landlord the costs for such services.

9. **Utilities.** The services and/or utilities set forth below serving Property shall be paid by either the Landlord or Tenant as follows: *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| UTILITY | TENANT | LANDLORD | UTILITY | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Water | ☐ | ☒ | Sewer | ☐ | ☒ |
| Electricity | ☒ | ☐ | Natural Gas | ☒ | ☐ |
| Garbage | ☒ | ☐ | Cable Television | ☐ | ☐ |
| Telephone | ☒ | ☐ | Digital Subscriber Line | ☐ | ☐ |
| Other ________ | ☐ | ☐ | Other ________ | ☐ | ☐ |

   Tenant shall be responsible for the costs of any utilities that Landlord has not expressly agreed to pay for in this Lease. Tenant must provide proof of payment of final bills for all utilities or service termination (cutoff) slips. Landlord may, at Landlord's option, pay utilities and be reimbursed by Tenant along with the next month's rent. Landlord shall not be liable for any interruptions or delays in the provision of utility services unless such interruptions or delays shall be caused by Landlord's gross negligence or willful misconduct.

10. **Renewal Term.** Either party may terminate this Lease at the end of the term by giving the other party sixty (60) days written notice prior to the end of the term. If neither party gives notice of termination, the Lease will automatically be extended on a month-to-month basis with all terms remaining the same except that Landlord reserves the right to increase the amount of rent upon delivery of written notice to Tenant sixty (60) days prior to the effective date of any increase. Thereafter, Tenant may terminate this Lease upon sixty (60) days written notice to Landlord and Landlord may terminate this Lease upon sixty (60) days written notice to Tenant.

11. **Sublet and Assignment.** Tenant may not sublet Property in whole or in part or assign this Lease without the prior written consent of Landlord. This Lease shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord and this Lease shall create a usufruct only. In the event Landlord shall assign this Lease, the assignee thereof shall be responsible to timely pay Brokers all commissions and other sums owed to them hereunder.

Copyright© 2024 by Georgia Association of REALTORS®, Inc.

12. Right of Access, Signage.
   A. Landlord and Landlord's agents shall have the right of access to Property for inspection, repairs and maintenance during reasonable hours. In the case of emergency, Landlord may enter Property at any time to protect life and prevent damage to Property. Landlord and/or Landlord's agents may place a "for rent" or "for sale" sign on the interior or exterior of Property, and may show Property to prospective tenants or purchasers during reasonable hours. Tenant agrees to cooperate with Landlord, Landlord's agent and Brokers who may show Property to prospective Tenants. Tenant shall secure valuables and agrees to hold Landlord and/or Landlord's Agent harmless for any loss thereof. For each occasion where the access rights described above are denied. Tenant shall pay Landlord the sum of $ 0.00 as liquidated damages; it being acknowledged that Landlord shall be damaged by the denial of access, that Landlord's actual damages are hard to estimate, and that the above amount represents a reasonable pre-estimate of Landlord's damages rather than a penalty.
   B. Without Landlord's prior written permission, Tenant shall not place any sign, advertising matter, or any other things of any kind on any part of the outside walls or roof of Property or on any part of the interior of Property that is visible from the exterior of Property. Tenant shall maintain all such permitted signs, advertising matter, or any other things of any kind in good condition and repair. Tenant agrees to remove at its cost all such permitted signs, advertising matter, or any other things of any kind at the end of this Lease.

13. Use. Property shall only be used for the purposes set out as follows: Manufacturing/Storage
   Property shall be used so as to comply with all federal, state, county, and municipal laws and ordinances and any applicable rules and regulations. Tenant shall not use or permit Property to be used for any disorderly or unlawful purpose; nor shall Tenant engage in any activity on Property which would endanger the health and safety of other Tenants or which otherwise creates a nuisance.

14. Agency and Brokerage.
   A. **Agency Disclosure:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Tenant or Landlord greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;
      1. **No Agency Relationship:** Tenant and Landlord acknowledge that, if they are not represented by a Broker, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
      2. **Listing Broker:** Broker working with the Landlord is identified on the signature page as the "Listing Broker"; and said Broker ☐ is **OR** ☐ is not representing Landlord;
      3. **Leasing Broker:** Broker working with Tenant (including in transactions where Broker is representing Landlord) is identified on the signature page as "Leasing Broker;" and said Broker ☐ is **OR** ☐ is not representing Tenant; and
      4. **Dual Agency or Designated Agency:** If Tenant and Landlord are both being represented by the same Broker, a relationship of either ☒ designated agency **OR** ☐ dual agency shall exist.
         a. **Dual Agency Disclosure:** *[Applicable only if dual agency has been selected above.]*
         Tenant and Landlord are aware that Broker is acting as a dual agent in this transaction and consent to the same. Tenant and Landlord have been advised that:
         (1) In serving as a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;
         (2) Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;
         (3) Tenant and Landlord do not have to consent to dual agency and, the consent of Tenant and Landlord to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.
         (4) Notwithstanding any provision to the contrary contained herein, Tenant and Landlord each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.
         b. **Designated Agency Assignment:** *[Applicable only if the designated agency has been selected above.]*
         Broker has assigned Laura Beth Davis to work exclusively with Tenant as Tenant's designated agent and Mark Brewster to work exclusively with Owner/Landlord as Owner/Landlord's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.
   B. **Material Relationship Disclosure:** The Broker and/or affiliated licensees have no material relationship with either client except as follows:
   Mark Brewster is part owner of the property and leasing broker.
   (A material relationship means one actually known of a personal, familial or business nature between the Broker and/or affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

WB JM



TRANSACTIONS TransactionDesk Edition

C. **Brokerage:** The Brokers listed below have performed a valuable service in this transaction and are made parties hereunder to enforce their commission rights. Payment of commission to a Broker shall not create an agency or subagency relationship between Leasing Broker and either Landlord or Landlord's Broker. Landlord agrees to pay the Broker listed below and representing Landlord to lease and/or manage Property ("Listing Broker") a commission (which commission has already been negotiated in a separate agreement) of: *[Check one. The section not marked shall not be a part of this Agreement.]*

☐ $________ or _______ percent (%) of the total base rent to be paid under the Lease, which shall be due and payable upon occupancy.

☒ $________ or 7 percent (%) of base rents paid, which shall be due and payable upon Tenant's monthly payment of rent in the manner provided in the Rent Paragraph above.

In the event the Lease is made in cooperation with another Broker listed below as the Leasing Broker, the Listing Broker shall receive 6 percent (%) of the total real estate commission paid hereunder and the Leasing Broker shall receive 1 percent (%) of the total real estate commission paid hereunder. In the event Tenant and/or Landlord fail or refuse to perform any of their obligations herein, the non-performing party shall immediately pay the Listing Broker and the Leasing Broker their full commissions. The Listing Broker and Leasing Broker may jointly or independently pursue the non-performing party for that portion of the commission, which they would have otherwise received under the Lease.

15. **Default.** If Tenant defaults under this Lease, Landlord shall have the right to pursue any or all of its remedies under Georgia Law. A default shall include, but not be limited to, the failure of Tenant to pay Landlord rent or reimburse Landlord for damages, repairs or costs when due, the abandonment of the Property by Tenant (which shall include the discontinuance of the use of the Property by Tenant) and the failure of Tenant to comply with any of the terms of the Lease including any rules and regulations. Landlord shall give Tenant a ten (10) day notice of and opportunity to cure any non-monetary breach of this Lease. All remedies hereunder shall be cumulative and not concurrent. Tenant shall remain liable for rents from and after any action by Landlord under a proceeding against Tenant for holding over or distress warrant, whether or not Tenant retains the right to possession of Property.

16. **Rules and Regulations.**

A. Tenant is prohibited from adding, changing or in any way altering locks installed on the doors of Property without prior written permission of Landlord. If all keys to Property are not returned when Tenant vacates Property, Landlord may charge a re-key charge in the amount of $ 100.00.

B. ~~Motor vehicles with expired or missing license plates, non-operative vehicles, boats, trailers, RVs and campers are not permitted on Property. Any such vehicle may be removed by Landlord at the expense of Tenant, for storage or for public or private sale, at Landlord's option, and Tenant shall have no right or recourse against Landlord thereafter.~~

C. No goods or materials of any kind or description, which are combustible or would increase fire risk shall be kept in or placed on Property (except for goods and materials typically found in a general office use provided that the same are limited in quantity to that normally found in such use).

D. ~~No nails, screws or adhesive hangers except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of Property.~~

E. Tenant shall not place any objects or personal property on Property in a manner that is inconsistent with the load limits of Property. ~~Tenant shall consult Landlord before placing any heavy furniture, file cabinets, or other equipment in Property.~~

F. ~~Landlord shall provide heating and air conditioning to Property between ___ a.m. and ___ p.m., Monday to Friday (excluding public holidays); between ___ a.m. and ___ p.m., Saturday; and between ___ a.m. and ___ p.m., Sunday. Tenant shall notify Landlord by 4 p.m. of the preceding day of any requests for overtime heating and air conditioning. Landlord may charge Tenant its reasonable costs of providing such overtime heating and air conditioning.~~

G. ~~Tenant shall not, without Landlord's prior written consent, use any equipment which uses electric current in excess of 110 volts, which will increase the amount of electricity ordinarily furnished for use of Property as general office space, or which require clean circuits or other distribution circuits.~~

H. Landlord may establish additional reasonable Rules and Regulations concerning the maintenance, use, and operation of Property. Amendments and additions to the Rules and Regulations shall be effective upon delivery of a copy thereof to Tenant.

17. **Abandonment.** If Tenant removes or attempts to remove personal property from Property other than in the usual course of continuing occupancy, without having first paid Landlord all monies due, Property may be considered abandoned, and Landlord shall have the right, without notice, to store or dispose of any personal property left on Property by Tenant. Landlord shall also have the right to store or dispose of any of Tenant's personal property remaining on Property after the termination of this Lease. Any such personal property shall become Landlord's personal property.

18. **Estoppel Certificate.** Tenant shall, from time to time, upon Landlord's request execute, acknowledge, and deliver to Landlord, within ten days of such request, a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or if there has been modification thereof, that the same is in full force and effect as modified and stating the nature thereof); (b) that to the best of its knowledge there are no uncured defects on the part of the Landlord (or if any such defaults exist, a specific description thereof); (c) the date to which any rents or other charges have been paid in advance; and (d) any other reasonable matters requested by Landlord. Landlord and any prospective purchaser or transferee of Landlord's interest hereunder or any then existing or prospective mortgagee or grantee of any deed to secure debt may rely on such certificates.

19. **Property Loss.** Storage of personal property by Tenant shall be at Tenant's risk and Landlord shall not be responsible for any loss or damage. Tenant shall be responsible to insure Tenant's personal property against loss or damage. Landlord shall not be responsible or any damage to Tenant's property, unless such damage is caused by Landlord's gross negligence or willful misconduct.



TRANSACTIONS Transact onDesk Edition

20. **Destruction of Property.**

A. If earthquake, fire, storm, or other casualty shall totally destroy (or so substantially damage as to be untenable) Property, rent shall abate from the date of such destruction. Landlord shall have sixty (60) days to commence the restoration of Property to a tenable condition. If in Landlord's sole discretion restoration cannot be completed within 180 days following such destruction, Landlord may, by written notice furnished to Tenant within thirty (30) days of such destruction, terminate this Lease, whereupon rent and all other obligations hereunder shall be adjusted between the parties as of date of such destruction. In the event the Landlord elects to complete such restoration, but fails to do so within 180 days following such destruction, this Lease may be terminated as of the date of such destruction upon written notice from either party to the other given not more than ten (10) days following expiration of said 180 day period. If such notice is not given, then this Lease shall remain in force and rent shall commence upon delivery of Property to Tenant in a tenable condition.

B. If Property is damaged but not rendered wholly untenable by earthquake, fire, storm, or other casualty, rent shall abate in such proportion as Property have been damaged and Landlord shall restore Property as reasonably quickly as practicable whereupon full rent shall commence.

C. Rent shall not abate nor shall Tenant be entitled to terminate this Lease if the damage or destruction of Property, whether total or partial, is the result of the negligence of Tenants, its contractors, employees, agents, invitees, guests, or licensees.

21. **Alteration and Improvements.** Tenant shall not make or allow to be made any alterations, physical additions, or improvements in or to Property without first obtaining Landlord's prior written consent. Landlord may grant or withhold such consent within its reasonable discretion and may impose reasonable conditions upon its consent. All costs of any such alteration, addition, or improvement shall be borne by Tenant, unless otherwise agreed in writing. The provisions of the Work Letter, attached hereto as an Exhibit and a part of this Lease, shall govern any alterations or improvements to be performed prior to the Commencement Date of this Lease.

22. **Insurance.** Tenant agrees that during the term of the Lease, Tenant will carry and maintain, at its sole cost, the following types of insurance, in the amounts specified and in the form hereinafter provided for: *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

☒ **A. General Commercial Liability Insurance (or reasonable equivalent thereto):** Such insurance shall cover Property and Tenant's use thereof against claims for personal injury, bodily injury or death, property damage and products liability occurring upon, in, or about Property. The limits of such policy shall be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Such insurance shall be endorsed to cover independent contractors and contractual liability. Such insurance shall extend to any liability of Tenant arising out of the indemnities provided for in this Lease.

☒ **B. Fire and Extended Coverage Insurance (or reasonable equivalent thereto):** Such insurance shall cover Tenant's interest in its improvements to Property, and all furniture, equipment, supplies, and other property owned, leased, held or possessed by it and contained therein. Such insurance shall coverage shall be in an amount equal to not less than 100 percent (%) of full replacement cost as updated from time to time during the term of the Lease. Tenant shall promptly provide Landlord written notice in the event of any damages to persons or property occurring on Property from fire, accident, or any other casualty.

☒ **C. Workers' Compensation Insurance (or reasonable equivalent thereto):** Such insurance shall include coverage as required by applicable law.

☒ **D. Contractors Insurance (or reasonable equivalent thereto):** If Tenant engages any contractor or subcontractor to construct improvements or perform any other work on Property, Tenant shall require that such contractor or subcontractor have in force commercial general liability insurance, including personal injury coverage, contractual liability coverage, completed operations coverage, property damage endorsement, and, for any work which is subcontracted, contractors' protective liability coverage, insuring against any and all liability for injury to or death of a person or persons and for damage to property occasioned by or arising out of such work. The limits of such policy for both damage to property and bodily injury to be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Any such contractor or subcontractor shall also be required to maintain workers' compensation insurance as required by applicable law. All insurance policies procured and maintained herein (other than workers' compensation insurance) shall name Landlord, Landlord's property manager(s), Landlord's broker(s) and Landlord's lender as additional insureds, shall be carried with insurance companies licensed to do business in the State of Georgia and having a current financial strength rating in Best's Ratings of not less than B+. Such policies shall be non-cancellable and may not be materially altered except after thirty (30) days notice to Landlord. Such insurance policies or, at Landlord's election, duly executed certificates of such policies, accompanied by proof of the premium for such insurance, shall be delivered to Landlord before the earlier of (a) the initial entry by Landlord upon Property for the installation of its equipment or improvements; or (b) the Commencement Date of the Lease. Certificates of renewal of such insurance or copies of any replacement insurance policies, accompanied by proof of payment of the premiums for such insurance, shall be delivered to Landlord at least ten (10) days before the expiration of each respective policy term. Tenant shall comply with all rules and regulations applicable to Property issued by the Board of Fire Underwriters or by any body hereinafter constituted exercising similar functions. Tenant shall not intentionally do anything, or permit anything to be done, on or about Property that might adversely affect, contravene, or impair any policies of insurance that are in force for Property or any part thereof. Tenant shall pay all costs, damages, expenses, claims, fines, or penalties incurred by Landlord or Tenant because of Tenant's failure to comply with this Paragraph. Tenant indemnifies Landlord from all liability with reference thereto.

23. **Taxes.** Tenant shall pay any and all taxes (including assessments and license fees) assessed or imposed upon Tenant's fixtures, furniture, appliances, and personal property located in Property. *[Check one. The section not marked shall not be a part of Agreement.]*

☒ **A. Landlord Pays All Property Taxes:** Landlord shall pay all property taxes levied against Property. Tenant shall not pay any property taxes levied against Property.

Copyright© 2024 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS TransactionDesk Edition

☐B. **Tenant Pays Increases in Property Taxes:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional rent its Percentage Share of the amount by which all property taxes on the Premises for each tax year exceed property taxes on Property for the tax year ________. On or before the first day of the term of this Lease, Landlord will provide Tenant written notice of Landlord's estimate of the additional rent payable under this subparagraph. During December of each calendar year or as soon as practicable, Landlord will give Tenant written notice of its estimate of the payments to be made for the ensuing calendar year. On the first day of each month during the term of the Lease, Tenant will pay one-twelfth of the estimated amount in the manner provided in the Rent Paragraph. If notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after the notice is given. Within ninety (90) days after the close of each calendar year or as soon as practicable thereafter, Landlord will deliver to Tenant (1) a statement of property taxes for the calendar year certified by certified public accountants designated by Landlord; and (2) a statement of the payments made or to be made for the calendar year that has been prepared on the basis of the certified statement. If on the basis of those statements, Tenant owes an amount that is less than the estimated payments for the calendar year previously made by the Tenant, Landlord will pay Tenant the amount of the overpayment within thirty (30) days after delivery of those statements. If on the basis of those statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of those statements. If the Lease commences on a day other than the first day of the calendar year or ends on a day other than the last day of a calendar year, the amounts payable under this subparagraph shall be prorated on the basis the number of days of Term included in the years bears to 365.

24. **Sale of Property to Tenant.** Landlord shall pay Leasing Broker a commission in the amount of ___6___ percent (%) and Listing Broker a commission in the amount of ___1___ percent (%) of the gross sales price at closing if Tenant acquires from Landlord title to Property or any part thereof or any property as an addition, expansion, or substitution for Property during the term of this Lease, any renewals thereof, or within one year after the expiration of this Lease. Such commission shall be payable in lieu of any further commission which otherwise Broker would have been due under this Lease. Notwithstanding the above, Owner shall immediately give notice to Broker if and when: (a) Owner enters into a contract to sell Property; or (b) Owner closes on the sale of Property to another.

25. **Condemnation.** If all or any part of Property are taken or appropriated by any public or quasi-public authority under the power of eminent domain, and if the remaining portion of Property is thereby rendered untenable or unusable for the purposes herein stated, this Lease shall terminate when the condemning authority takes possession, and any rent paid for any period beyond possession by the condemning authority shall be repaid to Tenant. Landlord shall receive the entire condemnation award without deduction there from for any interest of Tenant in Property, but Tenant shall have the right to make a separate claim with the condemning authority for, and to receive therefore, (a) any moving expenses incurred by Tenant as a result of such condemnation; (b) any costs incurred or paid by Tenant in connection with any alteration or improvement made by Tenant to Property; (c) the value of Tenant's personal property taken; (d) Tenant's loss of business income; and (e) any other separate claim which Tenant may be permitted to make under applicable law, provided that such other separate claims shall not reduce or adversely affect the amount of Landlord's award.

26. **Disclaimer.** Tenant and Landlord acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Tenant and Landlord agree that Brokers shall not be responsible to advise Tenant on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of Property; the condition of Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to Property; mold; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of Property; any condition(s) existing off Property which may affect Property; the terms, conditions and availability of financing; and the uses and zoning of Property whether permitted or proposed. Tenant acknowledges that Broker is not an expert with respect to the above matters and that, if any of these matters or any other matters are of concern, Tenant should seek independent expert advice relative thereto. Tenant acknowledges that Broker shall not be responsible to monitor or supervise any portion of any construction or repairs to Property and that such tasks clearly fall outside the scope of real estate brokerage services.

27. **Other Provisions.**
A. **Time of Essence:** Time is of the essence of this Lease.
B. **No Waiver:** Any failure of Landlord to insist upon the strict and prompt performance of any covenants or conditions of this Lease or any of the rules and regulations set forth herein shall not operate as a waiver of any such violation or of Landlord's right to insist on prompt compliance in the future of such covenant or condition, and shall not prevent a subsequent action by Landlord for any such violation. No provision, covenant or condition of this Lease may be waived by Landlord unless such waiver is in writing and signed by Landlord.
C. **Definitions:** "Landlord" as used in this Lease shall include its representatives, heirs, agents, assigns, and successors in title to Premises. Broker shall be considered the authorized agent of Landlord except to the extent specifically provided for herein. The terms "Landlord" and "Tenant" shall include singular and plural, and corporations, partnerships, companies or individuals, as may fit the particular circumstances. "Common Area" means all areas and facilities located in the building or complex upon which Property is located that are provided and designated by Landlord for the general non-exclusive use of Tenant and its employees, agents, invitees, guests, or licensees, and includes *[Check all that apply. The sections not marked shall not be a part of this Agreement]*:

| | | | |
|---|---|---|---|
| ☐ Exterior hallways | ☐ Lobby | ☐ Elevator | ☐ Driveway |
| ☐ Parking Area | ☐ Terrace | ☐ Loading Area | ☐ Restrooms |
| ☐ Trash Facilities | ☐ Stairs | ☐ Landscaped Area | ☐ Sidewalks |
| ☐ Exterior Walls | ☐ Exterior Windows | ☐ Other: ________ | |



TRANSACTIONS TransactionDesk Edition

"Property taxes" means any form of real or personal property taxes, assessments, special assessments, fees, charges, levies, penalties, service payments in lieu of taxes, excises, assessments, and charges for transit, housing, or any other purposes, impositions or taxes of every kind and nature whatsoever, assessed or levied by any authority having the power to tax against Property and/or Common Areas or any legal or equitable interest of Landlord in Property and/or Common Areas, whether imposed now or in the future, excepting only taxes measured by the net income of Landlord from all sources. Tenant's "Percentage Share" means the proportion that the floor area of Property bears to the floor area of the tenantable space in the building or complex. The floor area shall be measured on the basis of exterior dimensions except walls of Property which are common walls separating Property from premises occupied by other tenants. In such cases, floor area shall be measured from the centerline of the common wall. Tenant's Percentage Share in the Building or Complex is ____________ percent (%).

D. **Entire Agreement:** This Lease and any attached addenda and exhibits thereto shall constitute the entire Agreement between the parties and no verbal statement, promise, inducement or amendment not reduced to writing and signed by both parties shall be binding.

E. **Attorney's Fees and Costs of Collection:** Whenever any sums due hereunder are collected by law, or by attorney at law to prosecute such an action, then both parties agree that the prevailing party will be entitled to reasonable attorney's fees, plus all costs of collection.

F. **Indemnification:** Tenant agrees to indemnify and hold Landlord and Broker harmless from and against any and all injuries, damages, losses, suits and claims against Landlord and/or Broker arising out of or related to: (1) Tenant's failure to fulfill any condition of this Lease; (2) any damage or injury happening in or to the Premises and the Property or to any improvements thereon as a result of the acts or omissions of Tenant or Tenant's family members, invitees or licensees; (3) Tenant's failure to comply with local, state or federal law; (4) any judgment, lien or other encumbrance filed against the Premises or Property as a result of Tenant's actions and any damage or injury happening in or about the Premises or Property to Tenant or Tenant's family members, invitees or licensees (except if such damage or injury is caused by the intentional wrongful acts of Landlord or Broker); (5) failure to maintain or repair equipment or fixtures, where the party responsible for their maintenance uses commercially reasonable efforts to make the necessary repairs and Tenant covenants not to sue Landlord or Broker with respect to any of the above-referenced matters. In addition to the above Tenant agrees to hold Broker harmless from and against Owner of the Property not paying or keeping current with any mortgage, property taxes or home owners association fee's on the Property or not fulfilling the Owner's obligations under this lease. For the purpose of this paragraph, the term "Broker" shall include Broker and Broker's affiliated licensees, employees and if Broker is a licensed real estate brokerage firm, then officers, directors and owners of said firm.

G. **No Partnership:** Tenant by execution of this Lease is not a partner of Landlord in the conduct of its business or otherwise, or joint venturer, or a member of any joint enterprise with Landlord.

H. **No Recordation:** Tenant shall not record this Lease nor any short form memorandum thereof without Landlord's prior written consent.

I. **Notices:**

(1) **Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.

(2) **Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party; (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein) even if it is not opened by the recipient. Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

(3) **When Broker Is Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker and any affiliated licensee of the Broker representing a party in a client relationship shall be authorized agents of the party for the limited purpose of receiving notice and such notice to any of them shall for all purposes herein be deemed to be notice to the party. Notice to an authorized agent shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the notice provisions herein) even if it is not opened by the recipient. Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker or the Broker's affiliated licensees are authorized to receive notices delivered by a Delivery Service. The Broker, the Broker's staff and the affiliated licensees of the Broker shall not be authorized to receive notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent of a client shall be an authorized agent of the client for the purposes of receiving notice.

J. **Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is held to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

Copyright© 2024 by Georgia Association of REALTORS®, Inc.

28. **GAR Forms**: The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. Provisions in the GAR Forms are subject to differing interpretations by our courts other than what the parties may have intended. At times, our courts may strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

29. **Beware of Cyber Fraud**: Fraudulent e-mails attempting to get you to wire money to criminal computer hackers are increasingly common in real estate transactions. Under this scam, computer hackers fraudulently assume the online identity of the actual mortgage lender, closing attorney and/or real estate broker with whom you are working in the real estate transaction. Posing as a legitimate company, they then direct you to wire money to them. In many cases, the fraudulent e-mail is sent from what appears to be the authentic web page of the legitimate company responsible for sending the wiring instructions. You should use great caution in sending or receiving funds based solely on wiring instructions sent to you by e-mail. Independently verifying the wiring instructions with someone from the company sending them is the best way to prevent fraud. In particular, you should treat as highly suspect any follow up e-mails you receive from a mortgage lender, closing attorney and/or real estate broker directing you to wire funds to a revised account number. Never verify wiring instructions by calling a telephone number provided along with a second set of wiring instructions since you may end up receiving a fraudulent verification from the computer hackers trying to steal your money. Independently look up the telephone number of the company who is supposed to be sending you the wiring instructions to make sure you have the right one.

30. **Exhibits.** All exhibits attached hereto, listed below or referenced herein are made a part of this Lease. If any such exhibit conflicts with any preceding paragraph, said exhibit shall control:

- ☐ Exhibit "A" Legal Description
- ☒ Other Map of Leased Space (Exhibit A).
- ☐ Other ______.

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any exhibits or preceding paragraph, shall control.

1) Tenant shall have the option to extend this lease for an additional 5 years (60 months) at a rate of $25,405 + the increase in the CPI from 1/1/25. Tenant must give written notice to Landlord with 120 days of the expiration of the initial term.

2) Landlord understands and agrees that the facility is to be used for the manufacturing of roof trusses, residential and commercials floors and shall not implement rules or regulations inconsistent therewith, nor preclude reasonable modifications to the premises to allow for such use.

3) Landlord has the right to lease the same to Tenant and that it is unaware of any condition, hidden or otherwise, that would preclude Tenant from occupation and use of the premises as contemplated herein.

4)Tenant shall have the use of concrete pad (highlighted in yellow on map). Access must be kept for other to access the back door area in between Sections F&G as well as Shipping areas.

5)Yard access is granted on the corner of John Davenport and Division St if Tenant does not renew lease for 401/403 John Davenport.

6)Duty/Task list attached to determine which party (Landlord/Tenant) is responsible for miscellaneous remodel items. (Exhibit B)

7)Tenant to have free use of half of the "Outside Pad Space". If Tenant would like to add on to the building in the future, A ground lease will be put in place.

☐ **Additional Special Stipulations (F246) are attached.**

Copyright© 2024 by Georgia Association of REALTORS®, Inc.

By signing this Agreement, Tenant and Landlord acknowledge that they have each read and understood this Agreement and agree to its terms.

| Tenant | Landlord |
|---|---|
| 1 Tenant's Signature: James T. Manis, CEO | 1 Landlord's Signature: [signature] |
| Print or Type Name: Wain Enterprises, LLC James T. Manis | Print or Type Name: Mark Brewster for Fairbanks Holdings |
| Date: 12/11/2024 | Date: 12/18/24 |
| Tenant's E-mail Address: jtmanis@wheelers.com | Landlord's E-mail Address: |
| 2 Tenant's Signature: | 2 Landlord's Signature: |
| Print or Type Name: dba Wheeler's | Print or Type Name: |
| Date: | Date: |
| Tenant's E-mail Address: | Landlord's E-mail Address: |
| ☐ Additional Signature Page (F931) is attached. | ☐ Additional Signature Page (F931) is attached. |

| Leasing Broker/Affiliated Licensee Contact Information | Listing Broker/Affiliated Licensee Contact Information |
|---|---|
| Leasing Broker: Garden Lakes Realty | Listing Broker: Garden Lakes Realty |
| Broker/Affiliated Licensee Signature: | Broker/Affiliated Licensee Signature: [signature] |
| Print or Type Name: | Print or Type Name: Mark Brewster |
| GA Real Estate License #: | GA Real Estate License #: 215869 |
| Licensee's Phone Number: | Licensee's Phone Number: 706-346-7553 |
| Fax Number: | Fax Number: |
| Licensee's E-mail Address: | Licensee's Email Address: brewster@gardenlakesrealty.com |
| REALTOR® Membership: | REALTOR® Membership: GRBOR |
| Broker's Address: 2400 Garden Lakes Blvd, Rome, GA 30165 | Broker's Address: 2400 Garden Lakes Blvd, Rome GA 30165 |
| Broker's Phone Number: 706.234.9421 | Broker's Phone Number: 706.234.9421 |
| Fax Number: | Fax Number: |
| MLS Office Code: GLRC01 | MLS Office Code: GLRC01 |
| Brokerage Firm License Number: 33954 | Brokerage Firm License Number: 33954 |

Multiple Listing Number ______________

**Binding Agreement Date:** The Binding Agreement Date in this Lease is the date of 12/18/2024 and has been filled in by MACK BREWSTER.

JM

## Exhibit A – Legal Description of Property

499 John Davenport Drive Rome 30165




499 John Davenport- Leased areas

| | |
|---|---|
| A | 30,745 |
| ?? | 882 |
| N | 1,723 |
| Office | 293 |
| B/C | 13,600 |
| L of B/C | 3,600 |
| Kiln | 685 |
| E | 8,640 |
| Break | 805 |
| Total | 60,973 sq ft |

Tenant's Initials

Landlord's Initials

499 John Davenport- Leased areas

| | |
|---|---|
| A | 30,745 |
| ?? | 882 |
| N | 1,723 |
| Office | 293 |
| B/C | 13,600 |
| L of B/C | 3,600 |
| Kiln | 685 |
| E | 8,640 |
| Break | 805 |
| Total | 60,973 sq ft |



EXHIBIT "B"

LANDLORD TENANT

11-22-2024

| Duty/Task - "A", "C", "E", "N", Portions of "B" | Resposible Party | Completion |
|---|---|---|
| All code related items to make space CO ready | Fairbanks | We have a CO; anything in particular here? CO items from your reno are on you correct? |
| New fire exit door (location tbd) on North side of building | Fairbanks | To be located to the right of electrical boxes of the North wall by May 30, 2025. |
| Any required fire door signage | Fairbanks | Okay |
| Removal of existing compressor equipment | Fairbanks | By May 30, 2025 |
| Split power service at main | Fairbanks | By May 30, 2025; we will pay power bill until split |
| Disconnect any existing services tied to remainder of facility (unleased) | Fairbanks | By May 30, 2025 |
| Maintenance of any future roof or window issues | Fairbanks | Okay |
| ~~Plumbing fixtures and labor for new men/women bathroom facility~~ | Fairbanks | |
| ~~Facility construction and electrical for new men/women bathroom facility~~ | Fairbanks | |
| Demotion of current women's bathroom | Wheelers | |
| Closure of openings to non-leased portions of facility | Fairbanks | Close/lock doors and add fencing in woodshop area by May 30, 2025 |
| Removal/fill of any floor hazards prior to occupancy | Fairbanks | Okay by March 31, 2025 (Areas to be marked by Dec 5th, 2024) |
| New opening South side of "A" accessing "B" for cart movement | Wheelers | |
| Separation gating/walls in "B" for portion of leased space for cart movement | Wheelers | |
| Removal of propane tanks and electrical from propane building | Fairbanks | Okay |
| Demolition of pad and building of propane facility | Wheelers | |
| Removal of former dust collection system on the north side of compressor room | Fairbanks | By May 30, 2025 |
| Addition of wall openings for roof line, component saw and jack table | Wheelers | |
| Creation of 20'+ Roll up on north side of building | Wheelers | |
| Construction of lumber storage on North side of facility | Wheelers | |
| Support for ties into existing sprinkler system (for lumber storage facility) - Dry system | Fairbanks | You have our approval to tie in |
| Cost of adding dry system portion | Wheelers | |
| Removal of roof ladder on the west side of "C" | Fairbanks | Okay by May 30, 2025 |
| Demolition of inset room in "E" | Wheelers | |
| Support with City in gaining road access between properties | Fairbanks | You have our support, we will attend meetings |
| Support with City in stormwater improvements | Fairbanks | You have our support, we will attend meetings |
| Water/sewer service to facility as needed (Non manufacturing) | Fairbanks | We will provide water sewer to your facilility for non-manufacturing use |
| New locking systems on all facility doors (access codes shared) | Wheelers | |
| Security systems to facility | Wheelers | |
| Maintenance and inspection of fire suppression systems | Fairbanks | Okay |
| Necessary construction permits | Wheelers | |
| New rollup door on the east side of "E" | Wheelers | |
| ~~Removal of all existing manufacturing equipment 30 days prior to occupancy~~ | Fairbanks | |

**EXHIBIT "B"**

Garden Lakes REALTY COMPANY

# COMMERCIAL LEASE AGREEMENT

(Single-Tenant Facilities)

Georgia REALTORS

2022 Printing

In consideration of the mutual covenants set forth herein, this Lease (hereafter the term "Lease" and "Agreement" are used interchangeably) is entered into this date of 10/25/2022 between GARDEN LAKES REALTY, CO (hereinafter "Landlord") and WAIN ENTERPRISES, LLC dba Wheeler's (hereinafter "Tenant") Landlord leases to Tenant, and Tenant leases from Landlord, the Property with the following address: 401 JOHN DAVENPORT DRIVE, NW, ROME, Georgia 30165 TAXPIN/ID# PART OF I13Z031 and as more particularly described in the Legal Description Paragraph below:

**Legal Description**. The legal description of the Property is attached as an exhibit hereto and incorporated herein.

1. **Term.** The initial term of this Lease shall be for 36 MONTHS beginning on the earlier of the completion of the work described in any attached Work letter or the date 12/1/2022 ("Commencement Date"), through and including the date of 11/30/2025.

2. **Possession.** If Landlord is unable to deliver possession of Property on the Commencement Date, rent shall be abated on a daily basis until possession is granted. If possession is not granted within fourteen (14) days from the Commencement Date, Tenant may terminate this Lease in which event Landlord shall promptly refund all payments and deposits to Tenant. Landlord shall not be liable for delays in the delivery of possession to Tenant.

3. **Rent.** Tenant shall pay base rent to Landlord without demand, deduction, or setoff in advance in the sum of $ 8,000.00, Eight Thousand Dollars per month on the first day of each month during the term of the Lease or any renewals thereof, at the following address: GARDEN LAKES REALTY, 2400 GARDEN LAKES BLVD, ROME GA 30165 (or at such other address as may be designated from time to time by Landlord in writing). If the Commencement Date begins on the second day through the last day of any month, the rent shall be prorated for that portion of the month and shall be paid at the time of leasing Property. Tenant shall also pay additional rent as may be provided elsewhere in this Lease. Such additional rent shall be paid in the same manner as the base rent.

4. **Late Payment; Service Charge for Returned Checks.** Rent not paid in full by the fifth day of the month shall be late. Landlord shall have no obligation to accept any rent not received by the fifth of the month. If late payment is made and Landlord accepts the same, the payment must be in the form of cash, cashier's check or money order and must include an additional rent amount of $ 500.00 and, if applicable, a service charge for any returned check of $ 40.00. Landlord reserves the right to refuse to accept personal checks from Tenant after one or more of Tenant's personal checks have been returned by the bank unpaid.

5. **Security Deposit.**
   A. **Security Deposit to be Held by Landlord or Broker:** *[Check one. The section not marked shall not be a part of this Agreement.]*
   ☐ Landlord Holding Security Deposit:
   (1) Tenant has paid to Landlord as security for Tenant's fulfillment of the conditions of this Lease a security deposit of $_____, _____ Dollars in ☐ cash, ☐ money order and/or ☐ check ("Security Deposit").
   (2) Landlord shall deposit the Security Deposit in Landlord's general account with Landlord retaining the interest if the account is interest bearing. Tenant acknowledges and agrees that Landlord shall have the right to use such funds for whatever purpose Landlord sees fit, and such funds will not be segregated or set apart in any manner.
   (3) Tenant recognizes and accepts the risk of depositing the Security Deposit with Landlord. Tenant acknowledges that Tenant has not relied upon the advise of any Broker in deciding to pay such Security Deposit to Landlord. Landlord and Tenant acknowledge and agree that:
   (a) Broker has no responsibility for, or control over, any Security Deposit deposited with Landlord;
   (b) Broker has no ability or obligation to insure that the Security Deposit is properly applied or deposited;
   (c) The disposition of the Security Deposit is the sole responsibility of Landlord and Tenant as herein provided; and
   (d) Landlord and Tenant agree to indemnify and hold harmless Broker and Broker's affiliated licensees against all claims, damages, losses, expenses or liability arising from the handling of the Security Deposit by Landlord.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Mark Brewster IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2022 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

(4) Landlord shall return Security Deposit to Tenant, after deducting any sum which Tenant owes Landlord hereunder, or any sum which Landlord may expend to repair arising out of or related to Tenant's occupancy hereunder, abandonment of Property or default in this Lease (provided Landlord attempts to mitigate such actual damages), including but not limited to any repair, replacement, cleaning or painting of Property reasonably necessary due to the negligence, carelessness, accident, or abuse of Tenant or Tenant's employees, agents, invitees, guests, or licensees. In the event Landlord elects to retain any part of the Security Deposit, Landlord shall promptly provide Tenant with a written statement setting forth the reasons for the retention of any portion of the Security Deposit, including the damages for which any portion of the Security Deposit is retained. The use and application of the Security Deposit by Landlord shall be at the discretion of the Landlord. Appropriation by Landlord of all or part of the Security Deposit shall not be an exclusive remedy for Landlord, but shall be cumulative, and in addition to all remedies of Landlord at law or under this Lease. The Tenant may not apply the Security Deposit to any rent payment.

☒ **Broker Holding Security Deposit:**

(1) Tenant has paid to Broker as security for Tenant's fulfillment of the conditions of this Lease ("Security Deposit") $ 8,000.00 , Eight Thousand Dollars in ☐ cash, ☐ money order and/or ☒ check.

(2) The Broker shall deposit the Security Deposit in Broker's escrow/trust account (with Broker retaining the interest if the account is interest bearing) within five (5) banking days from the Binding Agreement Date.

(3) Broker shall disburse the Security Deposit only as follows: (a) upon the failure of the parties to enter into a binding lease; (b) upon a subsequent written agreement signed by all parties having an interest in the funds; (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the security deposit; (d) upon a reasonable interpretation of this Agreement by Broker; (e) as provided in the General Provisions section below of this Paragraph; or (f) upon the termination of the agency relationship between Landlord and Broker, in which event Broker shall only disburse the Security Deposit, to another licensed Georgia Real Estate Broker selected by Landlord unless otherwise agreed to in writing by Landlord and Tenant after notice to Broker and Tenant. Prior to disbursing the Security Deposit pursuant to a reasonable interpretation of this Agreement; Broker shall give all parties fifteen (15) days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Broker prior to the end of the fifteen (15) day notice period. All objections not raised in a timely manner, shall be waived. In the event a timely objection is made, Broker shall consider the objection and shall do any or a combination of the following: (a) hold the Security Deposit for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the Security Deposit and so notify all parties; and/or (c) interplead the Security Deposit into a court of competent jurisdiction. Broker shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Broker. No party shall seek damages from Broker (nor shall Broker be liable for the same) for any matter arising out of or related to the performance of Broker's duties under this Security Deposit paragraph.

B. **General Provisions Regarding Security Deposit:**

(1) In the event any Security Deposit check is not honored, for any reason, by the bank upon which it is drawn, the holder thereof shall promptly notify the other parties and Broker(s) to this Lease. Tenant shall have three (3) banking days after notice to deliver good funds to the holder. In the event Tenant does not timely deliver good funds to the holder, the Landlord shall have the right to terminate this Agreement upon written notice to the Tenant.

(2) The entire Security Deposit, if held by Landlord, will be returned to Tenant within thirty (30) days after Property is vacated if: (a) The term of the Lease has expired or the Lease has been terminated in writing by the mutual consent of both parties; (b) All monies due under this Lease by Tenant have been paid; (c) Property is not damaged and is left in its original condition, normal wear and tear excepted; (d) All keys have been returned; and (e) Tenant is not in default under any of the terms of this Lease.

6. **Repairs and Maintenance.** Tenant acknowledges that Tenant has inspected Property and that it is fit for its stated use. Tenant agrees that no representations regarding Property or the condition thereof and no promises to alter, decorate, improve, or repairs have been made by Landlord, Broker, or their agents unless specified in this Lease. The following shall be kept in good working order and repair, normal wear and tear expected, by either the Landlord or Tenant as follows:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| | TENANT | LANDLORD | | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Heating system | ☐ | ☐ | Elevators | ☐ | ☐ |
| Plumbing system | ☐ | ☒ | Air conditioning system | ☐ | ☐ |
| Parking area | ☒ | ☐ | Electrical system/fixtures | ☐ | ☐ |
| Driveway | ☒ | ☐ | Exterior walkways | ☐ | ☐ |
| Building Exteriors | ☐ | ☐ | Interior hallways | ☐ | ☐ |
| Smoke detector | ☒ | ☐ | Lobby | ☐ | ☐ |
| Terrace/patio | ☐ | ☐ | Loading Area | ☒ | ☐ |
| Restrooms | ☒ | ☐ | Trash Facilities | ☒ | ☐ |
| Stairs | ☐ | ☐ | Landscaping | ☒ | ☐ |
| Exterior windows | ☐ | ☒ | Other ROOF & EXTERIOR | ☐ | ☒ |
| Security Alarm | ☒ | ☐ | Other ____________ | ☐ | ☐ |

Any item not mentioned herein but existing on Property (other than furniture, fixtures and equipment of Tenant) shall be maintained by: *[Check one. The box not marked shall not be a part of this Agreement.]* ☐ Landlord **OR** ☒ Tenant

Copyright© 2022 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

Upon receipt of written notice from Tenant, Landlord shall, within a reasonable time period thereafter, repair all defects in those facilities and systems that are the responsibility of Landlord to maintain in good working order and repair. If Tenant does not promptly perform its maintenance and repair obligations as set forth herein, Landlord may make such repairs and/or replacements and Tenant shall promptly pay the costs of the same. Landlord shall not be liable to Tenant for any damage caused by any of the above referenced systems or facilities or by water coming through or around the roof or any door, flashing, skylight, vent, window, or the like in or about Property, except if such damage is due to the gross negligence or willful misconduct of Landlord. Tenant shall be responsible for the reasonable costs of repairs made necessary by the negligence or willful misconduct of Tenant (including Tenant's employees, agents, invitees, guests, or licensees).

7. **Services.** Landlord shall provide, at Landlord's expense the following services:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*
- ☐ General cleaning and janitorial service of the interior of Property ________ times per week
- ☐ Concierge service as follows: ________
- ☐ Parking attendant as follows: ________
- ☐ Property monitor as follows: ________
- ☐ Trash collection service ________ times per week
- ☐ Soap, paper towels, and toilet tissue for rest rooms ________ times per week
- ☐ Replacement of all light bulbs and repair and maintenance of all light fixtures located in the interior of Property.
- ☐ Other ________.

Landlord shall not be liable for the nonperformance or inadequate performance of such services by third parties. Tenant shall be responsible for the costs and provision of any services that Landlord has not expressly agreed to pay for in this Lease. Tenant agrees to provide services not provided by Landlord that are necessary to keep Property in good order, condition, and repair, normal wear and tear excepted. If Tenant does not provide such services, Landlord may then provide such services and Tenant shall promptly pay Landlord the costs for such services.

8. **Utilities.** The services and/or utilities set forth below serving Property shall be paid by either the Landlord or Tenant as follows:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| UTILITY | TENANT | LANDLORD | UTILITY | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Water | ☒ | ☐ | Sewer | ☒ | ☐ |
| Electricity | ☒ | ☐ | Natural Gas | ☐ | ☐ |
| Garbage | ☒ | ☐ | Cable Television | ☐ | ☐ |
| Telephone | ☐ | ☐ | Digital Subscriber Line | ☐ | ☐ |
| Other ________ | ☐ | ☐ | Other ________ | ☐ | ☐ |

Tenant shall be responsible for the costs of any utilities that Landlord has not expressly agreed to pay for in this Lease. Tenant must provide proof of payment of final bills for all utilities or service termination (cutoff) slips. Landlord may, at Landlord's option, pay utilities and be reimbursed by Tenant along with the next month's rent. Landlord shall not be liable for any interruptions or delays in the provision of utility services unless such interruptions or delays shall be caused by Landlord's gross negligence or willful misconduct.

9. **Renewal Term.** Either party may terminate this Lease at the end of the term by giving the other party sixty (60) days written notice prior to the end of the term. If neither party gives notice of termination, the Lease will automatically be extended on a month-to-month basis with all terms remaining the same except that Landlord reserves the right to increase the amount of rent upon delivery of written notice to Tenant sixty (60) days prior to the effective date of any increase. Thereafter, Tenant may terminate this Lease upon sixty (60) days written notice to Landlord and Landlord may terminate this Lease upon sixty (60) days written notice to Tenant.

10. **Sublet and Assignment.** Tenant may not sublet Property in whole or in part or assign this Lease without the prior written consent of Landlord. This Lease shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord and this Lease shall create a usufruct only. In the event Landlord shall assign this Lease, the assignee thereof shall be responsible to timely pay Brokers all commissions and other sums owed to them hereunder.

11. **Right of Access, Signage.**
A. Landlord and Landlord's agents shall have the right of access to Property for inspection, repairs and maintenance during reasonable hours. In the case of emergency, Landlord may enter Property at any time to protect life and prevent damage to Property. Landlord and/or Landlord's agents may place a "for rent" or "for sale" sign on the interior or exterior of Property, and may show Property to prospective tenants or purchasers during reasonable hours. Tenant agrees to cooperate with Landlord, Landlord's agent and Brokers who may show Property to prospective Tenants. Tenant shall secure valuables and agrees to hold Landlord and/or Landlord's Agent harmless for any loss thereof. For each occasion where the access rights described above are denied, Tenant shall pay Landlord the sum of $ 100.00 as liquidated damages; it being acknowledged that Landlord shall be damaged by the denial of access, that Landlord's actual damages are hard to estimate, and that the above amount represents a reasonable pre-estimate of Landlord's damages rather than a penalty.
B. Without Landlord's prior written permission, Tenant shall not place any sign, advertising matter, or any other things of any kind on any part of the outside walls or roof of Property or on any part of the interior of Property that is visible from the exterior of Property. Tenant shall maintain all such permitted signs, advertising matter, or any other things of any kind in good condition and repair. Tenant agrees to remove at its cost all such permitted signs, advertising matter, or any other things of any kind at the end of this Lease.



TRANSACTIONS

12. Use. Property shall only be used for the purposes set out as follows: Manufacturing/Storage

Property shall be used so as to comply with all federal, state, county, and municipal laws and ordinances and any applicable rules and regulations. Tenant shall not use or permit Property to be used for any disorderly or unlawful purpose; nor shall Tenant engage in any activity on Property which would endanger the health and safety of other Tenants or which otherwise creates a nuisance.

13. Agency and Brokerage.

A. **Agency Disclosure:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Landlord or Tenant greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;

1. **No Agency Relationship:** Landlord and Tenant acknowledge that, if they are not represented by a Broker, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
2. **Listing Broker.** Broker working with the Landlord is identified on the signature page as the "Listing Broker"; and said Broker ☐ is **OR** ☐ is not representing Landlord;
3. **Leasing Broker:** Broker working with Tenant (including in transactions where Broker is representing Landlord) is identified on the signature page as "Leasing Broker;" and said Broker ☐ is **OR** ☐ is not representing Tenant; and
4. **Dual Agency or Designated Agency:** If Landlord and Tenant are both being represented by the same Broker, a relationship of either ☐ designated agency **OR** ☒ dual agency shall exist.

a. **Dual Agency Disclosure:** *[Applicable only if dual agency has been selected above.]*
Tenant and Landlord are aware that Broker is acting as a dual agent in this transaction and consent to the same. Tenant and Landlord have been advised that:

(1) In serving as a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;

(2) Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;

(3) Tenant and Landlord do not have to consent to dual agency and, the consent of Tenant and Landlord to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.

(4) Notwithstanding any provision to the contrary contained herein, Tenant and Landlord each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.

b. **Designated Agency Assignment:** *[Applicable only if the designated agency has been selected above.]*
Broker has assigned LAURA BETH DAVIS to work exclusively with Tenant as Tenant's designated agent and MARK BREWSTER to work exclusively with Owner/Landlord as Owner/Landlord's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

B. **Material Relationship Disclosure:** The Broker and/or affiliated licensees have no material relationship with either client except as follows: MARK BREWSTER IS PART OWNER OF PROPERTY AND LEASING BROKER.
(A material relationship means one actually known of a personal, familial or business nature between the Broker and/or affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

C. **Brokerage:** The Brokers listed below have performed a valuable service in this transaction and are made parties hereunder to enforce their commission rights. Payment of commission to a Broker shall not create an agency or subagency relationship between Leasing Broker and either Landlord or Landlord's Broker. Landlord agrees to pay the Broker listed below and representing Landlord to lease and/or manage Property ("Listing Broker") a commission (which commission has already been negotiated in a separate agreement) of *[Check one. The section not marked shall not be a part of this Agreement]*:

☐ $______ or ____ percent (%) of the total base rent to be paid under the Lease, which shall be due and payable upon occupancy.

☒ $______ or 7 percent (%) of base rents paid, which shall be due and payable upon Tenant's monthly payment of rent in the manner provided in the Rent Paragraph above.

In the event the Lease is made in cooperation with another Broker listed below as the Leasing Broker, the Listing Broker shall receive SIX percent (%) of the total real estate commission paid hereunder and the Leasing Broker shall receive 1 percent (%) of the total real estate commission paid hereunder. In the event Tenant and/or Landlord fail or refuse to perform any of their obligations herein, the non-performing party shall immediately pay the Listing Broker and the Leasing Broker their full commissions. The Listing Broker and Leasing Broker may jointly or independently pursue the non-performing party for that portion of the commission, which they would have otherwise received under the Lease.

14. Default. If Tenant defaults under this Lease, Landlord shall have the right to pursue any or all of its remedies under Georgia Law. A default shall include, but not be limited to, the failure of Tenant to pay Landlord rent or reimburse Landlord for damages, repairs or costs when due, the abandonment of the Property by Tenant (which shall include the discontinuance of the use of the Property by Tenant) and the failure of Tenant to comply with any of the terms of the Lease including any rules and regulations. Landlord shall give Tenant a ten (10) day notice of and opportunity to cure any non-monetary breach of this Lease. All remedies hereunder shall be cumulative and not concurrent. Tenant shall remain liable for rents from and after any action by Landlord under a proceeding against Tenant for holding over or distress warrant, whether or not Tenant retains the right to possession of Property.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

TRANSACTIONS

15. Rules and Regulations.

A. Tenant is prohibited from adding, changing or in any way altering locks installed on the doors of Property without prior written permission of Landlord. If all keys to Property are not returned when Tenant vacates Property, Landlord may charge a re-key charge in the amount of $ 250.00.

B. ~~Motor vehicles with expired or missing license plates, non-operative vehicles, boats, trailers, RVs and campers are not permitted on Property. Any such vehicle may be removed by Landlord at the expense of Tenant, for storage or for public or private sale, at Landlord's option, and Tenant shall have no right or recourse against Landlord thereafter.~~ WB

C. No goods or materials of any kind or description, which are combustible or would increase fire risk shall be kept in or placed on Property (except for goods and materials typically found in a general office use provided that the same are limited in quantity to that normally found in such use).

~~D. No nails, screws or adhesive hangers except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of Property.~~ WB

E. Tenant shall not place any objects or personal property on Property in a manner that is inconsistent with the load limits of Property. Tenant shall consult Landlord before placing any heavy furniture, file cabinets, or other equipment in Property.

~~F. Landlord shall provide heating and air conditioning to Property between ___a.m. and ___p.m., Monday to Friday (excluding public holidays); between ___a.m. and ___p.m., Saturday; and between ___a.m. and ___p.m., Sunday. Tenant shall notify Landlord by 4 p.m. of the preceding day of any requests for overtime heating and air conditioning. Landlord may charge Tenant its reasonable costs of providing such overtime heating and air conditioning.~~ WB WB

G. Tenant shall not, without Landlord's prior written consent, use any equipment which uses electric current in excess of ~~110~~ 480 volts, which will increase the amount of electricity ordinarily furnished for use of Property as general office space, or which require clean circuits or other distribution circuits.

H. Landlord may establish additional reasonable Rules and Regulations concerning the maintenance, use, and operation of Property. Amendments and additions to the Rules and Regulations shall be effective upon delivery of a copy thereof to Tenant.

16. Abandonment. If Tenant removes or attempts to remove personal property from Property other than in the usual course of continuing occupancy, without having first paid Landlord all monies due, Property may be considered abandoned, and Landlord shall have the right, without notice, to store or dispose of any personal property left on Property by Tenant. Landlord shall also have the right to store or dispose of any of Tenant's personal property remaining on Property after the termination of this Lease. Any such personal property shall become Landlord's personal property.

17. Estoppel Certificate. Tenant shall, from time to time, upon Landlord's request execute, acknowledge, and deliver to Landlord, within ten days of such request, a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or if there has been modification thereof, that the same is in full force and effect as modified and stating the nature thereof); (b) that to the best of its knowledge there are no uncured defects on the part of the Landlord (or if any such defaults exist, a specific description thereof); (c) the date to which any rents or other charges have been paid in advance; and (d) any other reasonable matters requested by Landlord. Landlord and any prospective purchaser or transferee of Landlord's interest hereunder or any then existing or prospective mortgagee or grantee of any deed to secure debt may rely on such certificates.

18. Property Loss. Storage of personal property by Tenant shall be at Tenant's risk and Landlord shall not be responsible for any loss or damage. Tenant shall be responsible to insure Tenant's personal property against loss or damage. Landlord shall not be responsible or any damage to Tenant's property, unless such damage is caused by Landlord's gross negligence or willful misconduct.

19. Destruction of Property.

A. If earthquake, fire, storm, or other casualty shall totally destroy (or so substantially damage as to be untenable) Property, rent shall abate from the date of such destruction. Landlord shall have sixty (60) days to commence the restoration of Property to a tenable condition. If in Landlord's sole discretion restoration cannot be completed within 180 days following such destruction, Landlord may, by written notice furnished to Tenant within thirty (30) days of such destruction, terminate this Lease, whereupon rent and all other obligations hereunder shall be adjusted between the parties as of date of such destruction. In the event the Landlord elects to complete such restoration, but fails to do so within 180 days following such destruction, this Lease may be terminated as of the date of such destruction upon written notice from either party to the other given not more than ten (10) days following expiration of said 180 day period. If such notice is not given, then this Lease shall remain in force and rent shall commence upon delivery of Property to Tenant in a tenable condition.

B. If Property is damaged but not rendered wholly untenable by earthquake, fire, storm, or other casualty, rent shall abate in such proportion as Property have been damaged and Landlord shall restore Property as reasonably quickly as practicable whereupon full rent shall commence.

C. Rent shall not abate nor shall Tenant be entitled to terminate this Lease if the damage or destruction of Property, whether total or partial, is the result of the negligence of Tenants, its contractors, employees, agents, invitees, guests, or licensees.

20. Alteration and Improvements. Tenant shall not make or allow to be made any alterations, physical additions, or improvements in or to Property without first obtaining Landlord's prior written consent. Landlord may grant or withhold such consent within its reasonable discretion and may impose reasonable conditions upon its consent. All costs of any such alteration, addition, or improvement shall be borne by Tenant, unless otherwise agreed in writing. The provisions of the Work Letter, attached hereto as an Exhibit and a part of this Lease, shall govern any alterations or improvements to be performed prior to the Commencement Date of this Lease.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

21. **Insurance.** Tenant agrees that during the term of the Lease, Tenant will carry and maintain, at its sole cost, the following types of insurance, in the amounts specified and in the form hereinafter provided for:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

☒ A. **General Commercial Liability Insurance (or reasonable equivalent thereto):** Such insurance shall cover Property and Tenant's use thereof against claims for personal injury, bodily injury or death, property damage and products liability occurring upon, in, or about Property. The limits of such policy shall be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Such insurance shall be endorsed to cover independent contractors and contractual liability. Such insurance shall extend to any liability of Tenant arising out of the indemnities provided for in this Lease.

☒ B. **Fire and Extended Coverage Insurance (or reasonable equivalent thereto):** Such insurance shall cover Tenant's interest in its improvements to Property, and all furniture, equipment, supplies, and other property owned, leased, held or possessed by it and contained therein. Such insurance shall coverage shall be in an amount equal to not less than 500,000 percent (%) of full replacement cost as updated from time to time during the term of the Lease. Tenant shall promptly provide Landlord written notice in the event of any damages to persons or property occurring on Property from fire, accident, or any other casualty.

☒ C. **Workers' Compensation Insurance (or reasonable equivalent thereto):** Such insurance shall include coverage as required by applicable law.

☒ D. **Contractors Insurance (or reasonable equivalent thereto):** If Tenant engages any contractor or subcontractor to construct improvements or perform any other work on Property, Tenant shall require that such contractor or subcontractor have in force commercial general liability insurance, including personal injury coverage, contractual liability coverage, completed operations coverage, property damage endorsement, and, for any work which is subcontracted, contractors' protective liability coverage, insuring against any and all liability for injury to or death of a person or persons and for damage to property occasioned by or arising out of such work. The limits of such policy for both damage to property and bodily injury to be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Any such contractor or subcontractor shall also be required to maintain workers' compensation insurance as required by applicable law. All insurance policies procured and maintained herein (other than workers' compensation insurance) shall name Landlord, Landlord's property manager(s), Landlord's broker(s) and Landlord's lender as additional insureds, shall be carried with insurance companies licensed to do business in the State of Georgia and having a current financial strength rating in Best's Ratings of not less than B+. Such policies shall be non-cancellable and may not be materially altered except after thirty (30) days notice to Landlord. Such insurance policies or, at Landlord's election, duly executed certificates of such policies, accompanied by proof of the premium for such insurance, shall be delivered to Landlord before the earlier of (a) the initial entry by Landlord upon Property for the installation of its equipment or improvements; or (b) the Commencement Date of the Lease. Certificates of renewal of such insurance or copies of any replacement insurance policies, accompanied by proof of payment of the premiums for such insurance, shall be delivered to Landlord at least ten (10) days before the expiration of each respective policy term. Tenant shall comply with all rules and regulations applicable to Property issued by the Board of Fire Underwriters or by any body hereinafter constituted exercising similar functions. Tenant shall not intentionally do anything, or permit anything to be done, on or about Property that might adversely affect, contravene, or impair any policies of insurance that are in force for Property or any part thereof. Tenant shall pay all costs, damages, expenses, claims, fines, or penalties incurred by Landlord or Tenant because of Tenant's failure to comply with this Paragraph. Tenant indemnifies Landlord from all liability with reference thereto.

22. **Taxes.** Tenant shall pay any and all taxes (including assessments and license fees) assessed or imposed upon Tenant's fixtures, furniture, appliances, and personal property located in Property: *[Check one. The section not marked shall not be a part of Agreement.]*

☒ A. **Landlord Pays All Property Taxes:** Landlord shall pay all property taxes levied against Property. Tenant shall not pay any property taxes levied against Property.

☐ B. **Tenant Pays Increases in Property Taxes:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional rent the amount by which all property taxes on Property for each tax year exceed taxes on Property for the tax year ________. On or before the first day of the term of this Lease, Landlord will provide Tenant written notice of Landlord's estimate of the additional rent payable under this subparagraph. During December of each calendar year or as soon as practicable, Landlord will give Tenant written notice of its estimate of the payments to be made for the ensuing calendar year. On the first day of each month during the term of the Lease, Tenant will pay one-twelfth of the estimated amount in the manner provided in the Rent Paragraph. If notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after the notice is given. Within 90 (ninety) days after the close of each calendar year or as soon as practicable thereafter, Landlord will deliver to Tenant: (1) a statement of property taxes for the calendar year certified by certified public accountants designated by Landlord; and (2) a statement of the payments made or to be made for the calendar year that has been prepared on the basis of the certified statement. If on the basis of those statements, Tenant owes an amount that is less than the estimated payments for the calendar year previously made by the Tenant, Landlord will pay Tenant the amount of the overpayment within thirty (30) days after delivery of those statements. If on the basis of those statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of those statements. If the Lease commences on a day other than the first day of the calendar year or ends on a day other than the last day of a calendar year, the amounts payable under this subparagraph shall be prorated.

23. **Sale of Property to Tenant.** Landlord shall pay Leasing Broker a commission in the amount of 7 percent (%) and Listing Broker a commission in the amount of ________ percent (%) of the gross sales price at closing if Tenant acquires from Landlord title to Property or any part thereof or any property as an addition, expansion, or substitution for Property during the term of this Lease, any renewals thereof, or within one year after the expiration of this Lease. Such commission shall be payable in lieu of any further commission which otherwise Broker would have been due under this Lease. Notwithstanding the above, Owner shall immediately give notice to Broker if and when: (a) Owner enters into a contract to sell Property; or (b) Owner closes on the sale of Property to another.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

24. **Condemnation**. If all or any part of Property are taken or appropriated by any public or quasi-public authority under the power of eminent domain, and if the remaining portion of Property is thereby rendered untenable or unusable for the purposes herein stated, this Lease shall terminate when the condemning authority takes possession, and any rent paid for any period beyond possession by the condemning authority shall be repaid to Tenant. Landlord shall receive the entire condemnation award without deduction there from for any interest of Tenant in Property, but Tenant shall have the right to make a separate claim with the condemning authority for, and to receive therefore, (a) any moving expenses incurred by Tenant as a result of such condemnation; (b) any costs incurred or paid by Tenant in connection with any alteration or improvement made by Tenant to Property; (c) the value of Tenant's personal property taken; (d) Tenant's loss of business income; and (e) any other separate claim which Tenant may be permitted to make under applicable law, provided that such other separate claims shall not reduce or adversely affect the amount of Landlord's award.

25. **Disclaimer.** Tenant and Landlord acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Tenant and Landlord agree that Brokers shall not be responsible to advise Tenant on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of Property; the condition of Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to Property; mold; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of Property; any condition(s) existing off Property which may affect Property; the terms, conditions and availability of financing; and the uses and zoning of Property whether permitted or proposed. Tenant acknowledges that Broker is not an expert with respect to the above matters and that, if any of these matters or any other matters are of concern, Tenant should seek independent expert advice relative thereto. Tenant acknowledges that Broker shall not be responsible to monitor or supervise any portion of any construction or repairs to Property and that such tasks clearly fall outside the scope of real estate brokerage services.

26. **Other Provisions.**
   A. **Time of Essence:** Time is of the essence of this Lease.
   B. **No Waiver:** Any failure of Landlord to insist upon the strict and prompt performance of any covenants or conditions of this Lease or any of the rules and regulations set forth herein shall not operate as a waiver of any such violation or of Landlord's right to insist on prompt compliance in the future of such covenant or condition, and shall not prevent a subsequent action by Landlord for any such violation. No provision, covenant or condition of this Lease may be waived by Landlord unless such waiver is in writing and signed by Landlord.
   C. **Definitions:** "Landlord" as used in this Lease shall include its representatives, heirs, agents, assigns, and successors in title to Property. Broker shall be considered the authorized agent of Landlord except to the extent specifically provided for herein. The terms "Landlord" and "Tenant" shall include singular and plural, and corporations, partnerships, companies or individuals, as may fit the particular circumstances. The term "Binding Agreement Date" shall mean the date that this Lease has been signed by the Tenant and Landlord and a fully signed and executed copy thereof has been returned to the party making the offer to lease. "Property taxes" means any form of real or personal property taxes, assessments, special assessments, fees, charges, levies, penalties, service payments in lieu of taxes, excises, assessments, and charges for transit, housing, or any other purposes, impositions or taxes of every kind and nature whatsoever, assessed or levied by any authority having the power to tax against Property or any legal or equitable interest of Landlord in Property, whether imposed now or in the future, excepting only taxes measured by the net income of Landlord from all sources.
   D. **Entire Agreement:** This Lease and any attached addenda and exhibits thereto shall constitute the entire Agreement between the parties and no verbal statement, promise, inducement or amendment not reduced to writing and signed by both parties shall be binding.
   E. **Attorney's Fees and Costs of Collection:** Whenever any sums due hereunder are collected by law, or by attorney at law to prosecute such an action, then both parties agree that the prevailing party will be entitled to reasonable attorney's fees, plus all costs of collection.
   F. **Indemnification:** Tenant agrees to indemnify and hold Landlord and Broker harmless from and against any and all injuries, damages, losses, suits and claims against Landlord and/or Broker arising out of or related to: (1) Tenant's failure to fulfill any condition of this Lease; (2) any damage or injury happening in or to the Premises and the Property or to any improvements thereon as a result of the acts or omissions of Tenant or Tenant's family members, invitees or licensees; (3) Tenant's failure to comply with local, state or federal law; (4) any judgment, lien or other encumbrance filed against the Premises or Property as a result of Tenant's actions and any damage or injury happening in or about the Premises or Property to Tenant or Tenant's family members, invitees or licensees (except if such damage or injury is caused by the intentional wrongful acts of Landlord or Broker); (5) failure to maintain or repair equipment or fixtures, where the party responsible for their maintenance uses commercially reasonable efforts to make the necessary repairs and Tenant covenants not to sue Landlord or Broker with respect to any of the above-referenced matters. In addition to the above Tenant agrees to hold Broker harmless from and against Owner of the Property not paying or keeping current with any mortgage, property taxes or home owners association fee's on the Property or not fulfilling the Owner's obligations under this lease. For the purpose of this paragraph, the term "Broker" shall include Broker and Broker's affiliated licensees, employees and if Broker is a licensed real estate brokerage firm, then officers, directors and owners of said firm.
   G. **No Partnership:** Tenant by execution of this Lease is not a partner of Landlord in the conduct of its business or otherwise, or joint venturer, or a member of any joint enterprise with Landlord.
   H. **No Recordation:** Tenant shall not record this Lease nor any short form memorandum thereof without Landlord's prior written consent.
   I. **Notices:**
      (1) **Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.

(2) **Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party, (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein) even if it is not opened by the recipient. Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

(3) **When Broker Is Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker and any affiliated licensee of the Broker representing a party in a client relationship shall be authorized agents of the party for the limited purpose of receiving notice and such notice to any of them shall for all purposes herein be deemed to be notice to the party. Notice to an authorized agent shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the notice provisions herein) even if it is not opened by the recipient. Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker or the Broker's affiliated licensees are authorized to receive notices delivered by a Delivery Service. The Broker, the Broker's staff and the affiliated licensees of the Broker shall not be authorized to receive notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent of a client shall be an authorized agent of the client for the purposes of receiving notice.

J. **Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is held to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

27. **GAR Forms**: The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. Provisions in the GAR Forms are subject to differing interpretations by our courts other than what the parties may have intended. At times, our courts may strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

28. **Beware of Cyber Fraud**: Fraudulent e-mails attempting to get you to wire money to criminal computer hackers are increasingly common in real estate transactions. Under this scam, computer hackers fraudulently assume the online identity of the actual mortgage lender, closing attorney and/or real estate broker with whom you are working in the real estate transaction. Posing as a legitimate company, they then direct you to wire money to them. In many cases, the fraudulent e-mail is sent from what appears to be the authentic web page of the legitimate company responsible for sending the wiring instructions. You should use great caution in sending or receiving funds based solely on wiring instructions sent to you by e-mail. Independently verifying the wiring instructions with someone from the company sending them is the best way to prevent fraud. In particular, you should treat as highly suspect any follow up e-mails you receive from a mortgage lender, closing attorney and/or real estate broker directing you to wire funds to a revised account number. Never verify wiring instructions by calling a telephone number provided along with a second set of wiring instructions since you may end up receiving a fraudulent verification from the computer hackers trying to steal your money. Independently look up the telephone number of the company who is supposed to be sending you the wiring instructions to make sure you have the right one.

29. **Exhibits.** All exhibits attached hereto, listed below or referenced herein are made a part of this Lease. If any such exhibit conflicts with any preceding paragraph, said exhibit shall control:

☒ Exhibit "A" Legal Description

☒ Other SPECIAL STIPULATIONS (F246) .

☐ Other ________ .

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any exhibits or preceding paragraph, shall control.

1) LEASED PROPERTY INCLUDES 401 JOHN DAVENPORT DRIVE (APPROX 24,000 SQ FT BUILDING).

2) TENANT TO HEAT BUILDING DURING THE WINTER TO KEEP SPRINKLER SYSTEM FROM FREEZING (ONLY NECESSARY IN SUB FREEZING TEMPS)

☒ Additional Special Stipulations (F246) are attached.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

By signing this Agreement, Tenant and Landlord acknowledge that they have each read and understood this Agreement and agree to its terms.

| | |
|---|---|
| JAMES T MANIS, CEO | |
| 1 Tenant's Signature | 1 Landlord's Signature |
| Wain Enterprises, LLC dba Wheeler's | Mark Brewster for Fairbanks Co. |
| Print or Type Name | Print or Type Name |
| 11/11/2022 | |
| Date | Date |
| jtmanis@wheelers | |
| Tenant's E-mail Address | Landlord's E-mail Address |
| Accounts Payable: accountspayable@wheelers.com | |
| 2 Tenant's Signature | 2 Landlord's Signature |
| dba Wheeler's | |
| Print or Type Name | Print or Type Name |
| Date | Date |
| Tenant's E-mail Address | Landlord's E-mail Address |
| ☐ Additional Signature Page (F931) is attached. | ☐ Additional Signature Page (F931) is attached. |

| Leasing Broker/Affiliated Licensee Contact Information | | Listing Broker/Affiliated Licensee Contact Information | |
|---|---|---|---|
| Garden Lakes Realty | | GARDEN LAKES REALTY CO. | |
| Leasing Broker | | Listing Broker | |
| Broker/Affiliated Licensee Signature | | Broker/Affiliated Licensee Signature | |
| Laura Beth Davis | | MARK BREWSTER | 215869 |
| Print or Type Name | GA Real Estate License # | Print or Type Name | GA Real Estate License # |
| 706.234.9421 | | 706-346-7553 | |
| Licensee's Phone Number | Fax Number | Licensee's Phone Number | Fax Number |
| | | brewster@gardenlakesrealty.com | |
| Licensee's E-mail Address | | Licensee's Email Address | |
| REALTOR® Membership | | REALTOR® Membership | |
| Broker's Address | | Broker's Address | |
| 706.234.9421 | | 706.346.7553 | |
| Broker's Phone Number | Fax Number | Broker's Phone Number | Fax Number |
| GLRC01 | 33954 | GLRC01 | 33954 |
| MLS Office Code | Brokerage Firm License Number | MLS Office Code | Brokerage Firm License Number |
| Multiple Listing Number | | | |

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

Exhibit A – Legal Description of Property

401 JOHN DAVENPORT DRIVE, NW ROME 30165

JTM
Tenant's Initials

Landlord's Initials

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

Garden Lakes REALTY COMPANY

# SPECIAL STIPULATIONS

Georgia REALTORS®

2022 Printing

These Special Stipulations are part of the 401 JOHN DAVENPORT DRIVE, NW

Agreement dated 10/25/2022.

*[NOTE: The language set forth in this special stipulation(s) is furnished by the parties and is particular to this transaction.]*

1) LANDLORD TO: REPLACE MISSING WINDOWS, FIX/CLEAN TOILETS AND ENSURE WORKING ORDER, SWEEP/CLEAN FLOOR.

2) TENANT TO HAVE OPTION TO EXTEND LEASE FOR AN ADDITIONAL 3 YEARS AT A RATE OF $8000/MO + INCREASE IN THE CPI FROM 12/15/2022. TENANT MUST GIVE WRITTEN NOTICE TO LANDLORD WITHIN 90 DAYS OF EXPIRATION OF LEASE.

3) LANDLORD UNDERSTANDS AND AGREES THAT FACILITY IS TO BE USED FOR THE MANUFACTURE OF ROOF TRUSSES, RESIDENTIAL & COMMERCIAL FLOORS AND SHALL NOT IMPLEMENT RULES OR REGULATIONS INCONSISTENT THEREWITH, NOR PRECLUDE REASONABLE MODIFICATION TO THE PREMISES TO ALLOW FOR SUCH USE.

4) LANDLORD HAS THE RIGHT TO LEASE THE SAME TO TENANT AND THAT IT IS UNAWARE OF ANY CONDITION, HIDDEN OR OTHERWISE, THAT WOULD PRECLUDE TENANT FROM OCCUPATION AND USE OF THE PREMISES AS CONTEMPLATED HEREIN.

5) LANDLORD TO PROVIDE A COPY OF FIRE CERTIFICATION, REMOVE STEAM PIPES, INSTALL LIGHTING ON EXTERIOR OF BUILDING IN BETWEEN BUILDINGS 401 & 403, PLACE BOLLAR AROUND UTILITY POLE, REMOVE SMOG HOG, INSTALL WATER AND GAS METER, CLEAR COMPRESSOR ROOM (BY END OF JANUARY), CUTOFF ANY BOLTS EVEN WITH THE FLOOR AND REMOVE SOME OF THE SPRINKLER SYSTEM INSIDE OFFICE PORTION OF BUILDING.

6) TENANT HAS OPTION TO PURCHASE TRACT TWO (BUILDINGS AT 401/403/405 JOHN DAVENPORT; 3.46 ACRES/PLAT ATTACHED) FOR $1,725,000 WITHIN 3 YEARS. IF OPTION TO EXTEND THE LEASE IS EXERCISED, THE OPTION TO PURCHASE IS EXTENDED AS WELL. PRICE GOES UP 2.5% PER YEAR AFTER INITIAL PERIOD.

Buyer's/Tenant's Initials: JTM

Seller's/Landlord's Initials: WD

Buyer's/Tenant's Broker's Initials: ______
(or Broker's Affiliated Licensee)

Seller's/Landlord's Broker's Initials: WD
(or Broker's Affiliated Licensee)

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Mark Brewster IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2022 by Georgia Association of REALTORS®, Inc.

MINOR SUBDIVISION SURVEY FOR

# THE FAIRBANKS COMPANY

BEING CERTAIN TRACTS OF LAND LYING ON IN THE 3rd WARD OF THE CITY OF ROME IN LAND LOTS 202 & 239, 23rd DISTRICT, 3rd SECTION, FLOYD COUNTY, GEORGIA.




60 0 120 240
GRAPHIC SCALE IN FEET

JOB: 22FAIRBANKS
FILE: 202-23-3
SCALE: 1" = 120'
FIELD DATE: AUGUST 18, 2021
PLAT DATE: AUGUST 20, 2021
REVISED: FEB. 06, 2022

BURKE LAND SURVEYING
59 SAGE BRUSH LANE
SUMMERVILLE, GEORGIA
(706) 506-8509

NOTES:

1. BOUNDARY SHOWN HEREON WAS PREPARED WITHOUT BENEFIT OF A TITLE EXAM AND IS SUBJECT TO ANY EVIDANCE THAT MIGHT BE DISCOVERED BY A COMPLETE AND ACCURATE TITLE EXAM.

2. BEARINGS SHOWN HEREON HAVE BEEN CALCULATED FROM ANGLES TURNED AND ARE BASED UPON A PLAT FOR THE FAIRBANKS COMPANY BY DONALD LONG DATED APRIL 2, 1982.

3. THIS PROPERTY IS SUBJECT TO ALL EASEMENTS AND RIGHTS OF WAY.

4. THIS SURVEY WAS PREPARED FOR AND AUTHORIZED BY: MARK BREWSTER.

5. CORNER MARKERS LABELED AS MARKED IN FIELD.

6. PROPERTY IS SERVICED BY PUBLIC WATER AND SEWERAGE.

7.

7. THE PROPERTY SHOWN HEREON IS NOT IN AN AREA OF SPECIAL FLOOD HAZARDS PER F.E.M.A. OFFICIAL FLOOD MAP 13115C0189E DATED: 09-25-2009.

**CERTIFICATE OF FINAL PLAT APPROVAL**

ALL REQUIREMENTS OF THE ROME-FLOYD COUNTY UNIFIED LAND DEVELOPMENT CODE HAVE BEEN REPRESENTED AS BEING FULFILLED BY THIS PLAT AND THE RELATED AS-BUILT SURVEYS ON

THE ROME-FLOYD COUNTY PLANNING COMMISSION HEREBY APPROVED THIS PLAT FOR RECORDATION BY THE CLERK OF SUPERIOR COURT AND RECOGNIZED THE OWNER'S OFFER OF DEDICATION OF ALL AREAS AND PUBLIC IMPROVEMENTS SHOWN THEREON AND ON SAID AS-BUILT SURVEYS ON BEHALF OF THE PUBLIC, SUBJECT TO MAINTENANCE AND GUARANTEE BY THE OWNER FOR ONE YEAR FROM THE DATE OF THIS APPROVAL.

SIGNATURE OF PLANNING DIRECTOR OR DESIGNEE DATE:

**SURVEYOR'S CERTIFICATE**

AS REQUIRED BY SUBSECTION (c) OF O.C.G.A. SECTION 15-6-67, THIS PLAT HAS BEEN PREPARED BY LAND SURVEYOR AND APPROVED BY ALL APPLICABLE LOCAL JURDISDICATION FOR RECORDING AS EVIDENCED BY APPROVAL CERTIFICATES, SIGNATURES, STAMPS, OR STATEMENTS HEREON. SUCH APPROVALS OR AFFIRMATIONS SHOULD BE CONFIRMED WITH THE APPROPRIATE GOVERNMENTAL BODIES BY PURCHASER OR USER OF THIS PLAT AS TO INTENDED USE OF ANY PARCEL. FURTHERMORE, THE UNDERSIGNED LAND SURVEYOR CERTIFIES THAT HIS PLAT COMPLIES WITH THE MINIMUM TECHNICAL STANDARDS FOR PROPERTY SURVEYS IN GEORGIA AS SET BOTH IN THE RULES AND REQULATION OF THE GEORGIA BOARD OF REGISTRATION FOR PROFESSIONAL ENGINEERS AND LAND SURVEYORS AND AS SET BORTH IN O.C.G.A. SECTION 15-6-67.

IT IS HEREBY CERTIFIED THAT THIS PLAT IS TRUE AND CORRECT AND WAS PREPARED FROM AN ACTUAL SURVEY OF THE PROPERTY BY ME OR UNDER MY SUPERVISION AND THAT ALL MONUMENTS SHOWN HERE ACTUALLY EXIST. THIS SURVEY COMPLIES WITH BOTH THE RULES OF THE GEORGIA BOARD OF REGISTRATION FOR PROFESSIONAL ENGINEERS AND LAND SURVEYORS AND THE OFFICIAL CODE OF GEORGIA ANNOTATED (OCCA) 15-6-67 AS AMENDED BY HB1004 (2016). IN THAT WHERE A CONFLICT EXISTS BETWEEN THE TWO SETS OF SPECIFICATIONS, THEREQUIREMENTS OF LAW PREVAIL.

THE FIELD DATA UPON WHICH THIS PLAT IS BASED HAS A CLOSURE PRECISION OF ONE FOOT IN 18,430 AND AN ANGULAR ERROR OF 6" PER ANGLE POINT, AND WAS ADJUSTED USING COMPASS RULE. THIS SURVEY WAS PREPARED IN CONFORMITY WITH THE TECHNICAL STANDARDS FOR PROPERTY SURVEYS IN GEORGIA AS SET FORTH IN CHAPTER 180-7 OF THE GEORGIA PLAT ACT, O.C.G.A. 15-6-67. EQUIPMENT USED IN THIS SURVEY: CARLSON CR5 WITH A 360 PRISM.

THIS PLAT HAS BEEN CALCULATED FOR CLOSURE AND IS FOUND TO BE ACCURATE WITHIN ONE FOOT IN 520.626 FEET.

BY: EDDIE V. BURKE
GEORGIA REGISTERED LAND SURVEYOR NO. 2753

EASEMENT TO BE ESTABLISHED

MINOR SUBDIVISION SURVEY FOR

# THE FAIRBANKS COMPANY

BEING CERTAIN TRACTS OF LAND LYING ON IN THE 3rd WARD OF THE CITY OF ROME IN LAND LOTS 202 & 239, 23rd DISTRICT, 3rd SECTION, FLOYD COUNTY, GEORGIA.

JOB: 22FAIRBANKS
FILE: 202-23-3
SCALE: 1" = 120'
FIELD DATE: AUGUST 18, 2021
PLAT DATE: AUGUST 20, 2021
REVISED: FEB. 06, 2022

**BURKE LAND SURVEYING**
**59 SAGE BRUSH LANE**
**SUMMERVILLE, GEORGIA**
**(706) 506-8509**




60 0 120 240
GRAPHIC SCALE IN FEET

**CERTIFICATE OF FINAL PLAT APPROVAL**

ALL REQUIREMENTS OF THE ROME-FLOYD COUNTY UNIFIED LAND DEVELOPMENT CODE HAVE BEEN REPRESENTED AS BEING FULFILLED BY THIS PLAT AND THE RELATED AS-BUILT SURVEYS ON
THE ROME-FLOYD COUNTY PLANNING COMMISSION HEREBY APPROVED THIS PLAT FOR RECORDATION BY THE CLERK OF SUPERIOR COURT AND RECOGNIZED THE OWNER'S OFFER OF DEDICATION OF ALL AREAS AND PUBLIC IMPROVEMENTS SHOWN THEREON AND ON SAID AS-BUILT SURVEYS ON BEHALF OF THE PUBLIC, SUBJECT TO MAINTENANCE AND GUARANTEE BY THE OWNER FOR ONE YEAR FROM THE DATE OF THIS APPROVAL.

SIGNATURE OF PLANNING DIRECTOR OR DESIGNEE DATE:

**SURVEYOR'S CERTIFICATE**

AS REQUIRED BY SUBSECTION (c) OF O.C.G.A. SECTION 15-6-67. THIS PLAT HAS BEEN PREPARED BY LAND SURVEYOR AND APPROVED BY ALL APPLICABLE LOCAL JURDISDICATION FOR RECORDING AS EVIDENCED BY APPROVAL CERTIFICATES, SIGNATURES, STAMPS, OR STATEMENTS HEREON. SUCH APPROVALS OR AFFIRMATIONS SHOULD BE CONFIRMED WITH THE APPROPRIATE GOVERNMENTAL BODIES BY PURCHASER OR USER OF THIS PLAT AS TO INTENDED USE OF ANY PARCEL. FURTHERMORE, THE UNDERSIGNED LAND SURVEYOR CERTIFIES THAT HIS PLAT COMPLIES WITH THE MINIMUM TECHNICAL STANDARDS FOR PROPERTY SURVEYS IN GEORGIA AS SET BOTH IN THE RULES AND REGULATION OF THE GEORGIA BOARD OF REGISTRATION FOR PROFESSIONAL ENGINEERS AND LAND SURVEYORS AND AS SET BORTH IN O.C.G.A. SECTION 15-6-67.

IT IS HEREBY CERTIFIED THAT THIS PLAT IS TRUE AND CORRECT AND WAS PREPARED FROM AN ACTUAL SURVEY OF THE PROPERTY BY ME OR UNDER MY SUPERVISION AND THAT ALL MONUMENTS SHOWN HERE ACTUALLY EXIST. THIS SURVEY COMPLIES WITH BOTH THE RULES OF THE GEORGIA BOARD OF REGISTRATION FOR PROFESSIONAL ENGINEERS AND LAND SURVEYORS AND THE OFFICIAL CODE OF GEORGIA ANNOTATED (OCCA) 15-6-67 AS AMENDED BY HB1004 (2016), IN THAT WHERE A CONFLICT EXISTS BETWEEN THE TWO SETS OF SPECIFICATIONS, THEREQUIREMENTS OF LAW PREVAIL.

THE FIELD DATA UPON WHICH THIS PLAT IS BASED HAS A CLOSURE PRECISION OF ONE FOOT IN 18,430 AND AN ANGULAR ERROR OF 6" PER ANGLE POINT, AND WAS ADJUSTED USING COMPASS RULE. THIS SURVEY WAS PREPARED IN CONFORMITY WITH THE TECHNICAL STANDARDS FOR PROPERTY SURVEYS IN GEORGIA AS SET FORTH IN CHAPTER 180-7 OF THE GEORGIA PLAT ACT, O.C.G.A. 15-6-67. EQUIPMENT USED IN THIS SURVEY: CARLSON CR5 WITH A 360 PRISM.

THIS PLAT HAS BEEN CALCULATED FOR CLOSURE AND IS FOUND TO BE ACCURATE WITHIN ONE FOOT IN 520,626 FEET.

BY: EDDIE V. BURKE
GEORGIA REGISTERED LAND SURVEYOR NO. 2753

NOTES:

1. BOUNDARY SHOWN HEREON WAS PREPARED WITHOUT BENEFIT OF A TITLE EXAM AND IS SUBJECT TO ANY EVIDANCE THAT MIGHT BE DISCOVERED BY A COMPLETE AND ACCURATE TITLE EXAM.

2. BEARINGS SHOWN HEREON HAVE BEEN CALCULATED FROM ANGLES TURNED AND ARE BASED UPON A PLAT FOR THE FAIRBANKS COMPANY BY DONALD LONG DATED APRIL 2, 1982.

3. THIS PROPERTY IS SUBJECT TO ALL EASEMENTS AND RIGHTS OF WAY.

4. THIS SURVEY WAS PREPARED FOR AND AUTHORIZED BY: MARK BREWSTER.

5. CORNER MARKERS LABELED AS MARKED IN FIELD.

6. PROPERTY IS SERVICED BY PUBLIC WATER AND SEWERAGE.

7.
7. THE PROPERTY SHOWN HEREON IS NOT IN AN AREA OF SPECIAL FLOOD HAZARDS PER F.E.M.A. OFFICIAL FLOOD MAP 13115C0189E DATED: 09-25-2009.




Imagery ©2022 Google, Imagery ©2022 Maxar Technologies, U.S. Geological Survey, Map data ©2022 50 ft

**EXHIBIT “C”**

Garden Lakes Realty Company

# COMMERCIAL LEASE AGREEMENT

(Single-Tenant Facilities)

Georgia REALTORS

2022 Printing

In consideration of the mutual covenants set forth herein, this Lease (hereafter the term "Lease" and "Agreement" are used interchangeably) is entered into this date of 8/15/2022 between GARDEN LAKES REALTY, CO , (hereinafter "Landlord") and WAIN ENTERPRISES, LLC dba Wheeler's (hereinafter "Tenant") Landlord leases to Tenant, and Tenant leases from Landlord, the Property with the following address 403 JOHN DAVENPORT DRIVE, NW , ROME , Georgia 30165 TAXPIN/ID# PART OF I13Z031 and as more particularly described in the Legal Description Paragraph below.

**Legal Description**. The legal description of the Property is attached as an exhibit hereto and incorporated herein.

1. **Term.** The initial term of this Lease shall be for 36 MONTHS beginning on the earlier of the completion of the work described in any attached Work letter or the date 9/1/2022 ("Commencement Date"), through and including the date of 8/31/2025 .

2. **Possession.** If Landlord is unable to deliver possession of Property on the Commencement Date, rent shall be abated on a daily basis until possession is granted. If possession is not granted within fourteen (14) days from the Commencement Date, Tenant may terminate this Lease in which event Landlord shall promptly refund all payments and deposits to Tenant. Landlord shall not be liable for delays in the delivery of possession to Tenant.

3. **Rent.** Tenant shall pay base rent to Landlord without demand, deduction, or setoff in advance in the sum of $ 5,000.00 , Five Thousand Dollars per month on the first day of each month during the term of the Lease or any renewals thereof, at the following address: GARDEN LAKES REALTY, 2400 GARDEN LAKES BLVD, ROME GA 30165 (or at such other address as may be designated from time to time by Landlord in writing). If the Commencement Date begins on the second day through the last day of any month, the rent shall be prorated for that portion of the month and shall be paid at the time of leasing Property. Tenant shall also pay additional rent as may be provided elsewhere in this Lease. Such additional rent shall be paid in the same manner as the base rent.

4. **Late Payment; Service Charge for Returned Checks.** Rent not paid in full by the fifth day of the month shall be late. Landlord shall have no obligation to accept any rent not received by the fifth of the month. If late payment is made and Landlord accepts the same, the payment must be in the form of cash, cashier's check or money order and must include an additional rent amount of $ 500.00 and, if applicable, a service charge for any returned check of $ 40.00 . Landlord reserves the right to refuse to accept personal checks from Tenant after one or more of Tenant's personal checks have been returned by the bank unpaid.

5. **Security Deposit.**
   A. **Security Deposit to be Held by Landlord or Broker:** *[Check one. The section not marked shall not be a part of this Agreement.]*
   ☐ Landlord Holding Security Deposit:
      (1) Tenant has paid to Landlord as security for Tenant's fulfillment of the conditions of this Lease a security deposit of $________, ________ Dollars in ☐ cash, ☐ money order and/or ☐ check ("Security Deposit").
      (2) Landlord shall deposit the Security Deposit in Landlord's general account with Landlord retaining the interest if the account is interest bearing. Tenant acknowledges and agrees that Landlord shall have the right to use such funds for whatever purpose Landlord sees fit, and such funds will not be segregated or set apart in any manner.
      (3) Tenant recognizes and accepts the risk of depositing the Security Deposit with Landlord. Tenant acknowledges that Tenant has not relied upon the advise of any Broker in deciding to pay such Security Deposit to Landlord. Landlord and Tenant acknowledge and agree that:
         (a) Broker has no responsibility for, or control over, any Security Deposit deposited with Landlord;
         (b) Broker has no ability or obligation to insure that the Security Deposit is properly applied or deposited;
         (c) The disposition of the Security Deposit is the sole responsibility of Landlord and Tenant as herein provided; and
         (d) Landlord and Tenant agree to indemnify and hold harmless Broker and Broker's affiliated licensees against all claims, damages, losses, expenses or liability arising from the handling of the Security Deposit by Landlord.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Mark Brewster IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2022 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

(4) Landlord shall return Security Deposit to Tenant, after deducting any sum which Tenant owes Landlord hereunder, or any sum which Landlord may expend to repair arising out of or related to Tenant's occupancy hereunder, abandonment of Property or default in this Lease (provided Landlord attempts to mitigate such actual damages), including but not limited to any repair, replacement, cleaning or painting of Property reasonably necessary due to the negligence, carelessness, accident, or abuse of Tenant or Tenant's employees, agents, invitees, guests, or licensees. In the event Landlord elects to retain any part of the Security Deposit, Landlord shall promptly provide Tenant with a written statement setting forth the reasons for the retention of any portion of the Security Deposit, including the damages for which any portion of the Security Deposit is retained. The use and application of the Security Deposit by Landlord shall be at the discretion of the Landlord. Appropriation by Landlord of all or part of the Security Deposit shall not be an exclusive remedy for Landlord, but shall be cumulative, and in addition to all remedies of Landlord at law or under this Lease. The Tenant may not apply the Security Deposit to any rent payment.

☒ **Broker Holding Security Deposit:**

(1) Tenant has paid to Broker as security for Tenant's fulfillment of the conditions of this Lease ("Security Deposit") $ 5,000.00 , Five Thousand Dollars in ☐ cash, ☐ money order and/or ☒ check.

(2) The Broker shall deposit the Security Deposit in Broker's escrow/trust account (with Broker retaining the interest if the account is interest bearing) within five (5) banking days from the Binding Agreement Date.

(3) Broker shall disburse the Security Deposit only as follows: (a) upon the failure of the parties to enter into a binding lease; (b) upon a subsequent written agreement signed by all parties having an interest in the funds; (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the security deposit; (d) upon a reasonable interpretation of this Agreement by Broker; (e) as provided in the General Provisions section below of this Paragraph; or (f) upon the termination of the agency relationship between Landlord and Broker, in which event Broker shall only disburse the Security Deposit, to another licensed Georgia Real Estate Broker selected by Landlord unless otherwise agreed to in writing by Landlord and Tenant after notice to Broker and Tenant. Prior to disbursing the Security Deposit pursuant to a reasonable interpretation of this Agreement; Broker shall give all parties fifteen (15) days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Broker prior to the end of the fifteen (15) day notice period. All objections not raised in a timely manner, shall be waived. In the event a timely objection is made, Broker shall consider the objection and shall do any or a combination of the following: (a) hold the Security Deposit for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the Security Deposit and so notify all parties; and/or (c) interplead the Security Deposit into a court of competent jurisdiction. Broker shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Broker. No party shall seek damages from Broker (nor shall Broker be liable for the same) for any matter arising out of or related to the performance of Broker's duties under this Security Deposit paragraph.

**B. General Provisions Regarding Security Deposit:**

(1) In the event any Security Deposit check is not honored, for any reason, by the bank upon which it is drawn, the holder thereof shall promptly notify the other parties and Broker(s) to this Lease. Tenant shall have three (3) banking days after notice to deliver good funds to the holder. In the event Tenant does not timely deliver good funds to the holder, the Landlord shall have the right to terminate this Agreement upon written notice to the Tenant.

(2) The entire Security Deposit, if held by Landlord, will be returned to Tenant within thirty (30) days after Property is vacated if: (a) The term of the Lease has expired or the Lease has been terminated in writing by the mutual consent of both parties; (b) All monies due under this Lease by Tenant have been paid; (c) Property is not damaged and is left in its original condition, normal wear and tear excepted; (d) All keys have been returned; and (e) Tenant is not in default under any of the terms of this Lease.

6. **Repairs and Maintenance.** Tenant acknowledges that Tenant has inspected Property and that it is fit for its stated use. Tenant agrees that no representations regarding Property or the condition thereof and no promises to alter, decorate, improve, or repairs have been made by Landlord, Broker, or their agents unless specified in this Lease. The following shall be kept in good working order and repair, normal wear and tear expected, by either the Landlord or Tenant as follows:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| | TENANT | LANDLORD | | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Heating system | ☐ | ☐ | Elevators | ☐ | ☐ |
| Plumbing system | ☐ | ☒ | Air conditioning system | ☐ | ☐ |
| Parking area | ☒ | ☐ | Electrical system/fixtures | ☐ | ☐ |
| Driveway | ☒ | ☐ | Exterior walkways | ☐ | ☐ |
| Building Exteriors | ☐ | ☐ | Interior hallways | ☐ | ☐ |
| Smoke detector | ☒ | ☐ | Lobby | ☐ | ☐ |
| Terrace/patio | ☐ | ☐ | Loading Area | ☒ | ☐ |
| Restrooms | ☒ | ☐ | Trash Facilities | ☒ | ☐ |
| Stairs | ☐ | ☐ | Landscaping | ☒ | ☐ |
| Exterior windows | ☐ | ☒ | Other ROOF & EXTERIOR | ☐ | ☒ |
| Security Alarm | ☒ | ☐ | Other ______ | ☐ | ☐ |

Any item not mentioned herein but existing on Property (other than furniture, fixtures and equipment of Tenant) shall be maintained by *[Check one. The box not marked shall not be a part of this Agreement.]* ☐ Landlord **OR** ☒ Tenant

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

TRANSACTIONS

Upon receipt of written notice from Tenant, Landlord shall, within a reasonable time period thereafter, repair all defects in those facilities and systems that are the responsibility of Landlord to maintain in good working order and repair. If Tenant does not promptly perform its maintenance and repair obligations as set forth herein, Landlord may make such repairs and/or replacements and Tenant shall promptly pay the costs of the same. Landlord shall not be liable to Tenant for any damage caused by any of the above referenced systems or facilities or by water coming through or around the roof or any door, flashing, skylight, vent, window, or the like in or about Property, except if such damage is due to the gross negligence or willful misconduct of Landlord. Tenant shall be responsible for the reasonable costs of repairs made necessary by the negligence or willful misconduct of Tenant (including Tenant's employees, agents, invitees, guests, or licensees).

7. **Services.** Landlord shall provide, at Landlord's expense the following services: *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

- ☐ General cleaning and janitorial service of the interior of Property ________ times per week
- ☐ Concierge service as follows: ________
- ☐ Parking attendant as follows: ________
- ☐ Property monitor as follows: ________
- ☐ Trash collection service ________ times per week
- ☐ Soap, paper towels, and toilet tissue for rest rooms ________ times per week
- ☐ Replacement of all light bulbs and repair and maintenance of all light fixtures located in the interior of Property.
- ☐ Other ________

Landlord shall not be liable for the nonperformance or inadequate performance of such services by third parties. Tenant shall be responsible for the costs and provision of any services that Landlord has not expressly agreed to pay for in this Lease. Tenant agrees to provide services not provided by Landlord that are necessary to keep Property in good order, condition, and repair, normal wear and tear excepted. If Tenant does not provide such services, Landlord may then provide such services and Tenant shall promptly pay Landlord the costs for such services.

8. **Utilities.** The services and/or utilities set forth below serving Property shall be paid by either the Landlord or Tenant as follows: *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| UTILITY | TENANT | LANDLORD | UTILITY | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Water | ☒ | ☐ | Sewer | ☒ | ☐ |
| Electricity | ☒ | ☐ | Natural Gas | ☐ | ☐ |
| Garbage | ☒ | ☐ | Cable Television | ☐ | ☐ |
| Telephone | ☐ | ☐ | Digital Subscriber Line | ☐ | ☐ |
| Other ________ | ☐ | ☐ | Other ________ | ☐ | ☐ |

Tenant shall be responsible for the costs of any utilities that Landlord has not expressly agreed to pay for in this Lease. Tenant must provide proof of payment of final bills for all utilities or service termination (cutoff) slips. Landlord may, at Landlord's option, pay utilities and be reimbursed by Tenant along with the next month's rent. Landlord shall not be liable for any interruptions or delays in the provision of utility services unless such interruptions or delays shall be caused by Landlord's gross negligence or willful misconduct.

9. **Renewal Term.** Either party may terminate this Lease at the end of the term by giving the other party sixty (60) days written notice prior to the end of the term. If neither party gives notice of termination, the Lease will automatically be extended on a month-to-month basis with all terms remaining the same except that Landlord reserves the right to increase the amount of rent upon delivery of written notice to Tenant sixty (60) days prior to the effective date of any increase. Thereafter, Tenant may terminate this Lease upon sixty (60) days written notice to Landlord and Landlord may terminate this Lease upon sixty (60) days written notice to Tenant.

10. **Sublet and Assignment.** Tenant may not sublet Property in whole or in part or assign this Lease without the prior written consent of Landlord. This Lease shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord and this Lease shall create a usufruct only. In the event Landlord shall assign this Lease, the assignee thereof shall be responsible to timely pay Brokers all commissions and other sums owed to them hereunder.

11. **Right of Access, Signage.**

A. Landlord and Landlord's agents shall have the right of access to Property for inspection, repairs and maintenance during reasonable hours. In the case of emergency, Landlord may enter Property at any time to protect life and prevent damage to Property. Landlord and/or Landlord's agents may place a "for rent" or "for sale" sign on the interior or exterior of Property, and may show Property to prospective tenants or purchasers during reasonable hours. Tenant agrees to cooperate with Landlord, Landlord's agent and Brokers who may show Property to prospective Tenants. Tenant shall secure valuables and agrees to hold Landlord and/or Landlord's Agent harmless for any loss thereof. For each occasion where the access rights described above are denied, Tenant shall pay Landlord the sum of $ 100.00 as liquidated damages; it being acknowledged that Landlord shall be damaged by the denial of access, that Landlord's actual damages are hard to estimate, and that the above amount represents a reasonable pre-estimate of Landlord's damages rather than a penalty.

B. Without Landlord's prior written permission, Tenant shall not place any sign, advertising matter, or any other things of any kind on any part of the outside walls or roof of Property or on any part of the interior of Property that is visible from the exterior of Property. Tenant shall maintain all such permitted signs, advertising matter, or any other things of any kind in good condition and repair. Tenant agrees to remove at its cost all such permitted signs, advertising matter, or any other things of any kind at the end of this Lease.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

12. **Use.** Property shall only be used for the purposes set out as follows: STORAGE

Property shall be used so as to comply with all federal, state, county, and municipal laws and ordinances and any applicable rules and regulations. Tenant shall not use or permit Property to be used for any disorderly or unlawful purpose, nor shall Tenant engage in any activity on Property which would endanger the health and safety of other Tenants or which otherwise creates a nuisance.

13. **Agency and Brokerage.**

A. **Agency Disclosure:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and where the context would indicate, the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Landlord or Tenant greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq..

1. **No Agency Relationship:** Landlord and Tenant acknowledge that, if they are not represented by a Broker, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
2. **Listing Broker.** Broker working with the Landlord is identified on the signature page as the "Listing Broker"; and said Broker ☐ is OR ☐ is not representing Landlord.
3. **Leasing Broker:** Broker working with Tenant (including in transactions where Broker is representing Landlord) is identified on the signature page as "Leasing Broker;" and said Broker ☐ is OR ☐ is not representing Tenant, and
4. **Dual Agency or Designated Agency:** If Landlord and Tenant are both being represented by the same Broker, a relationship of either ☐ designated agency OR ☒ dual agency shall exist.

a. **Dual Agency Disclosure:** *[Applicable only if dual agency has been selected above.]*
Tenant and Landlord are aware that Broker is acting as a dual agent in this transaction and consent to the same. Tenant and Landlord have been advised that:

(1) In serving as a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;

(2) Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;

(3) Tenant and Landlord do not have to consent to dual agency and, the consent of Tenant and Landlord to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.

(4) Notwithstanding any provision to the contrary contained herein, Tenant and Landlord each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.

b. **Designated Agency Assignment:** *[Applicable only if the designated agency has been selected above.]*
Broker has assigned LAURA BETH DAVIS to work exclusively with Tenant as Tenant's designated agent and MARK BREWSTER to work exclusively with Owner/Landlord as Owner/Landlord's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

B. **Material Relationship Disclosure:** The Broker and/or affiliated licensees have no material relationship with either client except as follows: MARK BREWSTER IS PART OWNER OF PROPERTY AND LEASING BROKER
(A material relationship means one actually known of a personal, familial or business nature between the Broker and/or affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

C. **Brokerage:** The Brokers listed below have performed a valuable service in this transaction and are made parties hereunder to enforce their commission rights. Payment of commission to a Broker shall not create an agency or subagency relationship between Leasing Broker and either Landlord or Landlord's Broker. Landlord agrees to pay the Broker listed below and representing Landlord to lease and/or manage Property ("Listing Broker") a commission (which commission has already been negotiated in a separate agreement) of *[Check one. The section not marked shall not be a part of this Agreement]*:

☐ $ ________ or ________ percent (%) of the total base rent to be paid under the Lease, which shall be due and payable upon occupancy.

☒ $ ________ or 7 percent (%) of base rents paid, which shall be due and payable upon Tenant's monthly payment of rent in the manner provided in the Rent Paragraph above.

In the event the Lease is made in cooperation with another Broker listed below as the Leasing Broker, the Listing Broker shall receive SIX percent (%) of the total real estate commission paid hereunder and the Leasing Broker shall receive 6 percent (%) of the total real estate commission paid hereunder. In the event Tenant and/or Landlord fail or refuse to perform any of their obligations herein, the non-performing party shall immediately pay the Listing Broker and the Leasing Broker their full commissions. The Listing Broker and Leasing Broker may jointly or independently pursue the non-performing party for that portion of the commission, which they would have otherwise received under the Lease.

14. **Default.** If Tenant defaults under this Lease, Landlord shall have the right to pursue any or all of its remedies under Georgia Law. A default shall include, but not be limited to, the failure of Tenant to pay Landlord rent or reimburse Landlord for damages, repairs or costs when due, the abandonment of the Property by Tenant (which shall include the discontinuance of the use of the Property by Tenant) and the failure of Tenant to comply with any of the terms of the Lease including any rules and regulations. Landlord shall give Tenant a ten (10) day notice of and opportunity to cure any non-monetary breach of this Lease. All remedies hereunder shall be cumulative and not concurrent. Tenant shall remain liable for rents from and after any action by Landlord under a proceeding against Tenant for holding over or distress warrant, whether or not Tenant retains the right to possession of Property.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

15. Rules and Regulations.

A. Tenant is prohibited from adding, changing or in any way altering locks installed on the doors of Property without prior written permission of Landlord. If all keys to Property are not returned when Tenant vacates Property, Landlord may charge a re-key charge in the amount of $ 250.00

~~B. Motor vehicles with expired or missing license plates, non-operative vehicles, boats, trailers, RVs and campers are not permitted on Property. Any such vehicle may be removed by Landlord at the expense of Tenant, for storage or for public or private sale, at Landlord's option, and Tenant shall have no right or recourse against Landlord thereafter.~~ WD

C. No goods or materials of any kind or description, which are combustible or would increase fire risk shall be kept in or placed on Property (except for goods and materials typically found in a general office use provided that the same are limited in quantity to that normally found in such use).

D. ~~No nails, screws or adhesive hangers except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of Property.~~ WD

E. Tenant shall not place any objects or personal property on Property in a manner that is inconsistent with the load limits of Property. Tenant shall consult Landlord before placing any heavy furniture, file cabinets, or other equipment in Property.

F. Landlord shall provide heating and air conditioning to Property between ___ a.m. and ___ p.m., Monday to Friday (excluding public holidays); between ____ a.m. and ____ p.m., Saturday; and between ___ a.m. and ___ p. m., Sunday. Tenant shall notify Landlord by 4 p.m. of the preceding day of any requests for overtime heating and air conditioning. Landlord may charge Tenant its reasonable costs of providing such overtime heating and air conditioning.

G. Tenant shall not, without Landlord's prior written consent, use any equipment which uses electric current in excess of ~~110~~ 480 volts, WD which will increase the amount of electricity ordinarily furnished for use of Property as general office space, or which require clean circuits or other distribution circuits.

H. Landlord may establish additional reasonable Rules and Regulations concerning the maintenance, use, and operation of Property. Amendments and additions to the Rules and Regulations shall be effective upon delivery of a copy thereof to Tenant.

16. **Abandonment.** If Tenant removes or attempts to remove personal property from Property other than in the usual course of continuing occupancy, without having first paid Landlord all monies due, Property may be considered abandoned, and Landlord shall have the right, without notice, to store or dispose of any personal property left on Property by Tenant. Landlord shall also have the right to store or dispose of any of Tenant's personal property remaining on Property after the termination of this Lease. Any such personal property shall become Landlord's personal property.

17. **Estoppel Certificate.** Tenant shall, from time to time, upon Landlord's request execute, acknowledge, and deliver to Landlord, within ten days of such request, a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or if there has been modification thereof, that the same is in full force and effect as modified and stating the nature thereof); (b) that to the best of its knowledge there are no uncured defects on the part of the Landlord (or if any such defaults exist, a specific description thereof); (c) the date to which any rents or other charges have been paid in advance; and (d) any other reasonable matters requested by Landlord. Landlord and any prospective purchaser or transferee of Landlord's interest hereunder or any then existing or prospective mortgagee or grantee of any deed to secure debt may rely on such certificates.

18. **Property Loss.** Storage of personal property by Tenant shall be at Tenant's risk and Landlord shall not be responsible for any loss or damage. Tenant shall be responsible to insure Tenant's personal property against loss or damage. Landlord shall not be responsible for any damage to Tenant's property, unless such damage is caused by Landlord's gross negligence or willful misconduct.

19. **Destruction of Property.**

A. If earthquake, fire, storm, or other casualty shall totally destroy (or so substantially damage as to be untenable) Property, rent shall abate from the date of such destruction. Landlord shall have sixty (60) days to commence the restoration of Property to a tenable condition. If in Landlord's sole discretion restoration cannot be completed within 180 days following such destruction, Landlord may, by written notice furnished to Tenant within thirty (30) days of such destruction, terminate this Lease, whereupon rent and all other obligations hereunder shall be adjusted between the parties as of date of such destruction. In the event the Landlord elects to complete such restoration, but fails to do so within 180 days following such destruction, this Lease may be terminated as of the date of such destruction upon written notice from either party to the other given not more than ten (10) days following expiration of said 180 day period. If such notice is not given, then this Lease shall remain in force and rent shall commence upon delivery of Property to Tenant in a tenable condition.

B. If Property is damaged but not rendered wholly untenable by earthquake, fire, storm, or other casualty, rent shall abate in such proportion as Property have been damaged and Landlord shall restore Property as reasonably quickly as practicable whereupon full rent shall commence.

C. Rent shall not abate nor shall Tenant be entitled to terminate this Lease if the damage or destruction of Property, whether total or partial, is the result of the negligence of Tenants, its contractors, employees, agents, invitees, guests, or licensees.

20. **Alteration and Improvements.** Tenant shall not make or allow to be made any alterations, physical additions, or improvements in or to Property without first obtaining Landlord's prior written consent. Landlord may grant or withhold such consent within its reasonable discretion and may impose reasonable conditions upon its consent. All costs of any such alteration, addition, or improvement shall be borne by Tenant, unless otherwise agreed in writing. The provisions of the Work Letter, attached hereto as an Exhibit and a part of this Lease, shall govern any alterations or improvements to be performed prior to the Commencement Date of this Lease.

Copyright© 2022 by Georgia Association of REALTORS®, Inc.

21. **Insurance**. Tenant agrees that during the term of the Lease, Tenant will carry and maintain, at its sole cost, the following types of insurance, in the amounts specified and in the form hereinafter provided for *[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

☒ A. **General Commercial Liability Insurance (or reasonable equivalent thereto):** Such insurance shall cover Property and Tenant's use thereof against claims for personal injury, bodily injury or death, property damage and products liability occurring upon, in, or about Property. The limits of such policy shall be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Such insurance shall be endorsed to cover independent contractors and contractual liability. Such insurance shall extend to any liability of Tenant arising out of the indemnities provided for in this Lease.

☒ B. **Fire and Extended Coverage Insurance (or reasonable equivalent thereto):** Such insurance shall cover Tenant's interest in its improvements to Property, and all furniture, equipment, supplies, and other property owned, leased, held or possessed by it and contained therein. Such insurance shall coverage shall be in an amount equal to not less than 500,000 percent (%) of full replacement cost as updated from time to time during the term of the Lease. Tenant shall promptly provide Landlord written notice in the event of any damages to persons or property occurring on Property from fire, accident, or any other casualty.

☒ C. **Workers' Compensation Insurance (or reasonable equivalent thereto):** Such insurance shall include coverage as required by applicable law.

☒ D. **Contractors Insurance (or reasonable equivalent thereto):** If Tenant engages any contractor or subcontractor to construct improvements or perform any other work on Property, Tenant shall require that such contractor or subcontractor have in force commercial general liability insurance, including personal injury coverage, contractual liability coverage, completed operations coverage, property damage endorsement, and, for any work which is subcontracted, contractors' protective liability coverage, insuring against any and all liability for injury to or death of a person or persons and for damage to property occasioned by or arising out of such work. The limits of such policy for both damage to property and bodily injury to be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Any such contractor or subcontractor shall also be required to maintain workers' compensation insurance as required by applicable law. All insurance policies procured and maintained herein (other than workers' compensation insurance) shall name Landlord, Landlord's property manager(s), Landlord's broker(s) and Landlord's lender as additional insureds, shall be carried with insurance companies licensed to do business in the State of Georgia and having a current financial strength rating in Best's Ratings of not less than B+. Such policies shall be non-cancellable and may not be materially altered except after thirty (30) days notice to Landlord. Such insurance policies or, at Landlord's election, duly executed certificates of such policies, accompanied by proof of the premium for such insurance, shall be delivered to Landlord before the earlier of (a) the initial entry by Landlord upon Property for the installation of its equipment or improvements; or (b) the Commencement Date of the Lease. Certificates of renewal of such insurance or copies of any replacement insurance policies, accompanied by proof of payment of the premiums for such insurance, shall be delivered to Landlord at least ten (10) days before the expiration of each respective policy term. Tenant shall comply with all rules and regulations applicable to Property issued by the Board of Fire Underwriters or by any body hereinafter constituted exercising similar functions. Tenant shall not intentionally do anything, or permit anything to be done, on or about Property that might adversely affect, contravene, or impair any policies of insurance that are in force for Property or any part thereof. Tenant shall pay all costs, damages, expenses, claims, fines, or penalties incurred by Landlord or Tenant because of Tenant's failure to comply with this Paragraph. Tenant indemnifies Landlord from all liability with reference thereto.

22. **Taxes**. Tenant shall pay any and all taxes (including assessments and license fees) assessed or imposed upon Tenant's fixtures, furniture, appliances, and personal property located in Property: *[Check one. The section not marked shall not be a part of Agreement.]*

☒ A. **Landlord Pays All Property Taxes:** Landlord shall pay all property taxes levied against Property. Tenant shall not pay any property taxes levied against Property.

☐ B. **Tenant Pays Increases in Property Taxes:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional rent the amount by which all property taxes on Property for each tax year exceed taxes on Property for the tax year ________. On or before the first day of the term of this Lease, Landlord will provide Tenant written notice of Landlord's estimate of the additional rent payable under this subparagraph. During December of each calendar year or as soon as practicable, Landlord will give Tenant written notice of its estimate of the payments to be made for the ensuing calendar year. On the first day of each month during the term of the Lease, Tenant will pay one-twelfth of the estimated amount in the manner provided in the Rent Paragraph. If notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after the notice is given. Within 90 (ninety) days after the close of each calendar year or as soon as practicable thereafter, Landlord will deliver to Tenant: (1) a statement of property taxes for the calendar year certified by certified public accountants designated by Landlord, and (2) a statement of the payments made or to be made for the calendar year that has been prepared on the basis of the certified statement. If on the basis of those statements, Tenant owes an amount that is less than the estimated payments for the calendar year previously made by the Tenant, Landlord will pay Tenant the amount of the overpayment within thirty (30) days after delivery of those statements. If on the basis of those statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of those statements. If the Lease commences on a day other than the first day of the calendar year or ends on a day other than the last day of a calendar year, the amounts payable under this subparagraph shall be prorated.

23. **Sale of Property to Tenant.** Landlord shall pay Leasing Broker a commission in the amount of 3 percent (%) and Listing Broker a commission in the amount of 3 percent (%) of the gross sales price at closing if Tenant acquires from Landlord title to Property or any part thereof or any property as an addition, expansion, or substitution for Property during the term of this Lease, any renewals thereof, or within one year after the expiration of this Lease. Such commission shall be payable in lieu of any further commission which otherwise Broker would have been due under this Lease. Notwithstanding the above, Owner shall immediately give notice to Broker if and when: (a) Owner enters into a contract to sell Property; or (b) Owner closes on the sale of Property to another.

24. **Condemnation.** If all or any part of Property are taken or appropriated by any public or quasi-public authority under the power of eminent domain, and if the remaining portion of Property is thereby rendered untenable or unusable for the purposes herein stated, this Lease shall terminate when the condemning authority takes possession, and any rent paid for any period beyond possession by the condemning authority shall be repaid to Tenant. Landlord shall receive the entire condemnation award without deduction there from for any interest of Tenant in Property, but Tenant shall have the right to make a separate claim with the condemning authority for, and to receive therefore, (a) any moving expenses incurred by Tenant as a result of such condemnation, (b) any costs incurred or paid by Tenant in connection with any alteration or improvement made by Tenant to Property, (c) the value of Tenant's personal property taken, (d) Tenant's loss of business income, and (e) any other separate claim which Tenant may be permitted to make under applicable law provided that such other separate claims shall not reduce or adversely affect the amount of Landlord's award.

25. **Disclaimer.** Tenant and Landlord acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Tenant and Landlord agree that Brokers shall not be responsible to advise Tenant on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of Property; the condition of Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to Property; mold; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of Property; any condition(s) existing off Property which may affect Property; the terms, conditions and availability of financing; and the uses and zoning of Property whether permitted or proposed. Tenant acknowledges that Broker is not an expert with respect to the above matters and that, if any of these matters or any other matters are of concern, Tenant should seek independent expert advice relative thereto. Tenant acknowledges that Broker shall not be responsible to monitor or supervise any portion of any construction or repairs to Property and that such tasks clearly fall outside the scope of real estate brokerage services.

26. **Other Provisions.**

A. **Time of Essence:** Time is of the essence of this Lease.

B. **No Waiver:** Any failure of Landlord to insist upon the strict and prompt performance of any covenants or conditions of this Lease or any of the rules and regulations set forth herein shall not operate as a waiver of any such violation or of Landlord's right to insist on prompt compliance in the future of such covenant or condition, and shall not prevent a subsequent action by Landlord for any such violation. No provision, covenant or condition of this Lease may be waived by Landlord unless such waiver is in writing and signed by Landlord.

C. **Definitions:** "Landlord" as used in this Lease shall include its representatives, heirs, agents, assigns, and successors in title to Property. Broker shall be considered the authorized agent of Landlord except to the extent specifically provided for herein. The terms "Landlord" and "Tenant" shall include singular and plural, and corporations, partnerships, companies or individuals, as may fit the particular circumstances. The term "Binding Agreement Date" shall mean the date that this Lease has been signed by the Tenant and Landlord and a fully signed and executed copy thereof has been returned to the party making the offer to lease. "Property taxes" means any form of real or personal property taxes, assessments, special assessments, fees, charges, levies, penalties, service payments in lieu of taxes, excises, assessments, and charges for transit, housing, or any other purposes, impositions or taxes of every kind and nature whatsoever, assessed or levied by any authority having the power to tax against Property or any legal or equitable interest of Landlord in Property, whether imposed now or in the future, excepting only taxes measured by the net income of Landlord from all sources.

D. **Entire Agreement:** This Lease and any attached addenda and exhibits thereto shall constitute the entire Agreement between the parties and no verbal statement, promise, inducement or amendment not reduced to writing and signed by both parties shall be binding.

E. **Attorney's Fees and Costs of Collection:** Whenever any sums due hereunder are collected by law, or by attorney at law to prosecute such an action, then both parties agree that the prevailing party will be entitled to reasonable attorney's fees, plus all costs of collection.

F. **Indemnification:** Tenant agrees to indemnify and hold Landlord and Broker harmless from and against any and all injuries, damages, losses, suits and claims against Landlord and/or Broker arising out of or related to: (1) Tenant's failure to fulfill any condition of this Lease; (2) any damage or injury happening in or to the Premises and the Property or to any improvements thereon as a result of the acts or omissions of Tenant or Tenant's family members, invitees or licensees; (3) Tenant's failure to comply with local, state or federal law; (4) any judgment, lien or other encumbrance filed against the Premises or Property as a result of Tenant's actions and any damage or injury happening in or about the Premises or Property to Tenant or Tenant's family members, invitees or licensees (except if such damage or injury is caused by the intentional wrongful acts of Landlord or Broker); (5) failure to maintain or repair equipment or fixtures, where the party responsible for their maintenance uses commercially reasonable efforts to make the necessary repairs and Tenant covenants not to sue Landlord or Broker with respect to any of the above-referenced matters. In addition to the above Tenant agrees to hold Broker harmless from and against Owner of the Property not paying or keeping current with any mortgage, property taxes or home owners association fee's on the Property or not fulfilling the Owner's obligations under this lease. For the purpose of this paragraph, the term "Broker" shall include Broker and Broker's affiliated licensees, employees and if Broker is a licensed real estate brokerage firm, then officers, directors and owners of said firm.

G. **No Partnership:** Tenant by execution of this Lease is not a partner of Landlord in the conduct of its business or otherwise, or joint venturer, or a member of any joint enterprise with Landlord.

H. **No Recordation:** Tenant shall not record this Lease nor any short form memorandum thereof without Landlord's prior written consent.

I. **Notices:**

(1) **Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.

(2) **Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party, (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein) even if it is not opened by the recipient. Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

(3) **When Broker Is Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker and any affiliated licensee of the Broker representing a party in a client relationship shall be authorized agents of the party for the limited purpose of receiving notice and such notice to any of them shall for all purposes herein be deemed to be notice to the party. Notice to an authorized agent shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the notice provisions herein) even if it is not opened by the recipient. Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker or the Broker's affiliated licensees are authorized to receive notices delivered by a Delivery Service. The Broker, the Broker's staff and the affiliated licensees of the Broker shall not be authorized to receive notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent of a client shall be an authorized agent of the client for the purposes of receiving notice.

J. **Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is held to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

27. **GAR Forms:** The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. Provisions in the GAR Forms are subject to differing interpretations by our courts other than what the parties may have intended. At times, our courts may strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

28. **Beware of Cyber Fraud:** Fraudulent e-mails attempting to get you to wire money to criminal computer hackers are increasingly common in real estate transactions. Under this scam, computer hackers fraudulently assume the online identity of the actual mortgage lender, closing attorney and/or real estate broker with whom you are working in the real estate transaction. Posing as a legitimate company, they then direct you to wire money to them. In many cases, the fraudulent e-mail is sent from what appears to be the authentic web page of the legitimate company responsible for sending the wiring instructions. You should use great caution in sending or receiving funds based solely on wiring instructions sent to you by e-mail. Independently verifying the wiring instructions with someone from the company sending them is the best way to prevent fraud. In particular, you should treat as highly suspect any follow up e-mails you receive from a mortgage lender, closing attorney and/or real estate broker directing you to wire funds to a revised account number. Never verify wiring instructions by calling a telephone number provided along with a second set of wiring instructions since you may end up receiving a fraudulent verification from the computer hackers trying to steal your money. Independently look up the telephone number of the company who is supposed to be sending you the wiring instructions to make sure you have the right one.

29. **Exhibits.** All exhibits attached hereto, listed below or referenced herein are made a part of this Lease. If any such exhibit conflicts with any preceding paragraph, said exhibit shall control:

☒ Exhibit "A" Legal Description

☒ Other SPECIAL STIPULATIONS (F246)

☐ Other

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any exhibits or preceding paragraph, shall control.

1) LEASED PROPERTY INCLUDES 403 JOHN DAVENPORT DRIVE (APPROX 12,000 SQ FT BUILDING) AND THE CORNER LOT AT N. DIVISION STREET AND JOHN DAVENPORT DRIVE (APPROXIMATELY 1.5 ACRES). (MAP OF AREA ATTACHED TO THE LEASE).

2)TENANT TO HEAT BUILDING DURING THE WINTER TO KEEP SPRINKLER SYSTEM FROM FREEZING (ONLY NECESSARY IN SUB FREEZING TEMPS)

☒ Additional Special Stipulations (F246) are attached.

By signing this Agreement, Tenant and Landlord acknowledge that they have each read and understood this Agreement and agree to its terms.

James T. Manis, CEO
1 Tenant's Signature James T. Manis

Wain Enterprises, LLC dba Wheeler's
Print or Type Name

08/23/2022
Date

jtmanis@wheelers.com
Tenant's E-mail Address

Mark Brewster
1 Landlord's Signature

Mark Brewster for Fairbanks Co.
Print or Type Name

08/24/22
Date

Landlord's E-mail Address

2 Tenant's Signature

dba Wheeler's
Print or Type Name

Date

Tenant's E-mail Address

2 Landlord's Signature

Print or Type Name

Date

Landlord's E-mail Address

☐ Additional Signature Page (F931) is attached.

☐ Additional Signature Page (F931) is attached.

**Leasing Broker/Affiliated Licensee Contact Information**

Garden Lakes Realty
Leasing Broker

Laura Davis 08/25/22
Broker/Affiliated Licensee Signature

Laura Beth Davis
Print or Type Name

GA Real Estate License #

706.234.9421
Licensee's Phone Number

Fax Number

Licensee's E-mail Address

REALTOR® Membership

Broker's Address

706.234.9421
Broker's Phone Number

Fax Number

GLRC01
MLS Office Code

33954
Brokerage Firm License Number

Multiple Listing Number

**Listing Broker/Affiliated Licensee Contact Information**

GARDEN LAKES REALTY CO.
Listing Broker

Mark Brewster 08/24/22
Broker/Affiliated Licensee Signature

MARK BREWSTER
Print or Type Name

215869
GA Real Estate License #

706-346-7553
Licensee's Phone Number

Fax Number

brewster@gardenlakesrealty.com
Licensee's Email Address

REALTOR® Membership

Broker's Address

706.346.7553
Broker's Phone Number

Fax Number

GLRC01
MLS Office Code

33954
Brokerage Firm License Number

Copyright © 2022 by Georgia Association of REALTORS®, Inc.

Exhibit A – Legal Description of Property

403 JOHN DAVENPORT DRIVE, NW ROME 30165



AREAS INCLUDED IN LEASE

DRIVEWAYS TO REMAIN CLEAR AT ALL TIMES

Tenant's Initials

MB

Landlord's Initials

Garden Lakes Realty Company

# SPECIAL STIPULATIONS

Georgia REALTORS

2022 Printing

These Special Stipulations are part of the 403 JOHN DAVENPORT DRIVE, NW

Agreement dated 8/19/2022

*[NOTE: The language set forth in this special stipulation(s) is furnished by the parties and is particular to this transaction.]*

1) LANDLORD TO: TAKE FENCE/GATE DOWN AT WEST END OF BUILDING, REMOVE FIRE DOOR ON WEST END OF BUILDING, FIX 100A BREAKER FOR OFFICE, REPLACE MISSING WINDOWS, FIX/CLEAN TOILETS AND ENSURE WORKING ORDER, SWEEP/CLEAN FLOOR, REPLACE/REPAIR ANY BROKEN LIGHTS, REPLACE EAST DOCK DOOR, PROVIDE GATE KEY ACCESS, REPAIR ANY BROKEN OUTLETS AND CONFIRM ALL EXTERIOR LOCKS WORK AND PROVIDE 2 KEYS.

2) TENANT TO HAVE OPTION TO EXTEND YEAR FOR AN ADDITIONAL 3 YEARS AT A RATE OF $5000/MO + INCREASE IN THE CPI FROM (10/1/22). TENANT MUST GIVE WRITTEN NOTICE TO LANDLORD WITH 90 DAYS OF EXPIRATION OF LEASE.

3) LANDLORD UNDERSTANDS AND AGREES THAT FACILITY IS TO BE USED FOR THE MANUFACTURE OF ROOF TRUSSES, RESIDENTIAL & COMMERCIAL FLOORS AND SHALL NOT IMPLEMENT RULES OR REGULATIONS INCONSISTENT THEREWITH, NOR PRECLUDE REASONABLE MODIFICATION TO THE PREMISES TO ALLOW FOR SUCH USE.

4) LANDLORD HAS THE RIGHT TO LEASE THE SAME TO TENANT AND THAT IT IS UNAWARE OF ANY CONDITION, HIDDEN OR OTHERWISE, THAT WOULD PRECLUDE TENANT FROM OCCUPATION AND USE OF THE PREMISES AS CONTEMPLATED HEREIN.

Buyer's/Tenant's Initials: JM

Seller's/Landlord's Initials: MB

Buyer's/Tenant's Broker's Initials
(or Broker's Affiliated Licensee)

Seller's/Landlord's Broker's Initials: MB
(or Broker's Affiliated Licensee)

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Mark Brewster IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2022 by Georgia Association of REALTORS®, Inc.

F246, Special Stipulations, 01/01/22

TRANSACTIONS

**EXHIBIT "D"**

Garden Lakes REALTY COMPANY

# COMMERCIAL LEASE AGREEMENT
(Single-Tenant Facilities)

GeorgiaREALTORS

2023 Printing

In consideration of the mutual covenants set forth herein, this Lease (hereafter the term "Lease" and "Agreement" are used interchangeably) is entered into this date of 4/1/2023 between Garden Lakes Realty Co., (hereinafter "Landlord") and Wain Enterprises, LLC dba Wheeler's, (hereinafter "Tenant") Landlord leases to Tenant, and Tenant leases from Landlord, the Property with the following address: 405 John Davenport Drive, NW, Rome, Georgia 30165 TAXPIN/ID# Part of I13Z031 and as more particularly described in the Legal Description Paragraph below:

**Legal Description**. The legal description of the Property is attached as an exhibit hereto and incorporated herein.

1. **Term**. The initial term of this Lease shall be for 32 months beginning on the earlier of the completion of the work described in any attached Work letter or the date 4/1/2023 ("Commencement Date"), through and including the date of 11/30/2025.

2. **Possession**. If Landlord is unable to deliver possession of Property on the Commencement Date, rent shall be abated on a daily basis until possession is granted. If possession is not granted within fourteen (14) days from the Commencement Date, Tenant may terminate this Lease in which event Landlord shall promptly refund all payments and deposits to Tenant. Landlord shall not be liable for delays in the delivery of possession to Tenant.

3. **Rent**. Tenant shall pay base rent to Landlord without demand, deduction, or setoff in advance in the sum of $ 800.00, Eight Hundred Dollars per month on the first day of each month during the term of the Lease or any renewals thereof, at the following address: Garden Lakes Realty, 2400 Garden Lakes Blvd, Rome GA 30165 (or at such other address as may be designated from time to time by Landlord in writing). If the Commencement Date begins on the second day through the last day of any month, the rent shall be prorated for that portion of the month and shall be paid at the time of leasing Property. Tenant shall also pay additional rent as may be provided elsewhere in this Lease. Such additional rent shall be paid in the same manner as the base rent.

4. **Late Payment; Service Charge for Returned Checks.** Rent not paid in full by the fifth day of the month shall be late. Landlord shall have no obligation to accept any rent not received by the fifth of the month. If late payment is made and Landlord accepts the same, the payment must be in the form of cash, cashier's check or money order and must include an additional rent amount of $ 80.00 and, if applicable, a service charge for any returned check of $ 40.00. Landlord reserves the right to refuse to accept personal checks from Tenant after one or more of Tenant's personal checks have been returned by the bank unpaid.

5. **Security Deposit**.
   A. **Security Deposit to be Held by Landlord or Broker:** *[Check one. The section not marked shall not be a part of this Agreement.]*
      ☐ Landlord Holding Security Deposit:
      (1) Tenant has paid to Landlord as security for Tenant's fulfillment of the conditions of this Lease a security deposit of $______, ______ Dollars in ☐ cash, ☐ money order and/or ☐ check ("Security Deposit").
      (2) Landlord shall deposit the Security Deposit in Landlord's general account with Landlord retaining the interest if the account is interest bearing. Tenant acknowledges and agrees that Landlord shall have the right to use such funds for whatever purpose Landlord sees fit, and such funds will not be segregated or set apart in any manner.
      (3) Tenant recognizes and accepts the risk of depositing the Security Deposit with Landlord. Tenant acknowledges that Tenant has not relied upon the advise of any Broker in deciding to pay such Security Deposit to Landlord. Landlord and Tenant acknowledge and agree that:
      (a) Broker has no responsibility for, or control over, any Security Deposit deposited with Landlord;
      (b) Broker has no ability or obligation to insure that the Security Deposit is properly applied or deposited;
      (c) The disposition of the Security Deposit is the sole responsibility of Landlord and Tenant as herein provided; and
      (d) Landlord and Tenant agree to indemnify and hold harmless Broker and Broker's affiliated licensees against all claims, damages, losses, expenses or liability arising from the handling of the Security Deposit by Landlord.

THIS FORM IS COPYRIGHTED AND MAY ONLY BE USED IN REAL ESTATE TRANSACTIONS IN WHICH Mark Brewster IS INVOLVED AS A REAL ESTATE LICENSEE. UNAUTHORIZED USE OF THE FORM MAY RESULT IN LEGAL SANCTIONS BEING BROUGHT AGAINST THE USER AND SHOULD BE REPORTED TO THE GEORGIA ASSOCIATION OF REALTORS® AT (770) 451-1831.
Copyright© 2023 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

(4) Landlord shall return Security Deposit to Tenant, after deducting any sum which Tenant owes Landlord hereunder, or any sum which Landlord may expend to repair arising out of or related to Tenant's occupancy hereunder, abandonment of Property or default in this Lease (provided Landlord attempts to mitigate such actual damages), including but not limited to any repair, replacement, cleaning or painting of Property reasonably necessary due to the negligence, carelessness, accident, or abuse of Tenant or Tenant's employees, agents, invitees, guests, or licensees. In the event Landlord elects to retain any part of the Security Deposit, Landlord shall promptly provide Tenant with a written statement setting forth the reasons for the retention of any portion of the Security Deposit, including the damages for which any portion of the Security Deposit is retained. The use and application of the Security Deposit by Landlord shall be at the discretion of the Landlord. Appropriation by Landlord of all or part of the Security Deposit shall not be an exclusive remedy for Landlord, but shall be cumulative, and in addition to all remedies of Landlord at law or under this Lease. The Tenant may not apply the Security Deposit to any rent payment.

☐ **Broker Holding Security Deposit:**

(1) Tenant has paid to Broker as security for Tenant's fulfillment of the conditions of this Lease ("Security Deposit") $__________________, ______________________________ Dollars in ☐ cash, ☐ money order and/or ☐ check.

(2) The Broker shall deposit the Security Deposit in Broker's escrow/trust account (with Broker retaining the interest if the account is interest bearing) within five (5) banking days from the Binding Agreement Date.

(3) Broker shall disburse the Security Deposit only as follows: (a) upon the failure of the parties to enter into a binding lease; (b) upon a subsequent written agreement signed by all parties having an interest in the funds; (c) upon order of a court or arbitrator having jurisdiction over any dispute involving the security deposit; (d) upon a reasonable interpretation of this Agreement by Broker; (e) as provided in the General Provisions section below of this Paragraph; or (f) upon the termination of the agency relationship between Landlord and Broker, in which event Broker shall only disburse the Security Deposit, to another licensed Georgia Real Estate Broker selected by Landlord unless otherwise agreed to in writing by Landlord and Tenant after notice to Broker and Tenant. Prior to disbursing the Security Deposit pursuant to a reasonable interpretation of this Agreement; Broker shall give all parties fifteen (15) days notice, stating to whom the disbursement will be made. Any party may object in writing to the disbursement, provided the objection is received by Broker prior to the end of the fifteen (15) day notice period. All objections not raised in a timely manner, shall be waived. In the event a timely objection is made, Broker shall consider the objection and shall do any or a combination of the following: (a) hold the Security Deposit for a reasonable period of time to give the parties an opportunity to resolve the dispute; (b) disburse the Security Deposit and so notify all parties; and/or (c) interplead the Security Deposit into a court of competent jurisdiction. Broker shall be reimbursed for and may deduct from any funds interpleaded its costs and expenses, including reasonable attorney's fees. The prevailing party in the interpleader action shall be entitled to collect from the other party the costs and expenses reimbursed to Broker. No party shall seek damages from Broker (nor shall Broker be liable for the same) for any matter arising out of or related to the performance of Broker's duties under this Security Deposit paragraph.

**B. General Provisions Regarding Security Deposit:**

(1) In the event any Security Deposit check is not honored, for any reason, by the bank upon which it is drawn, the holder thereof shall promptly notify the other parties and Broker(s) to this Lease. Tenant shall have three (3) banking days after notice to deliver good funds to the holder. In the event Tenant does not timely deliver good funds to the holder, the Landlord shall have the right to terminate this Agreement upon written notice to the Tenant.

(2) The entire Security Deposit, if held by Landlord, will be returned to Tenant within thirty (30) days after Property is vacated if: (a) The term of the Lease has expired or the Lease has been terminated in writing by the mutual consent of both parties; (b) All monies due under this Lease by Tenant have been paid; (c) Property is not damaged and is left in its original condition, normal wear and tear excepted; (d) All keys have been returned; and (e) Tenant is not in default under any of the terms of this Lease.

6. **Repairs and Maintenance.** Tenant acknowledges that Tenant has inspected Property and that it is fit for its stated use. Tenant agrees that no representations regarding Property or the condition thereof and no promises to alter, decorate, improve, or repairs have been made by Landlord, Broker, or their agents unless specified in this Lease. The following shall be kept in good working order and repair, normal wear and tear expected, by either the Landlord or Tenant as follows:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| | TENANT | LANDLORD | | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Heating system | ☐ | ☐ | Elevators | ☐ | ☐ |
| Plumbing system | ☐ | ☐ | Air conditioning system | ☐ | ☐ |
| Parking area | ☐ | ☐ | Electrical system/fixtures | ☐ | ☐ |
| Driveway | ☐ | ☐ | Exterior walkways | ☐ | ☐ |
| Building Exteriors | ☐ | ☐ | Interior hallways | ☐ | ☐ |
| Smoke detector | ☐ | ☐ | Lobby | ☐ | ☐ |
| Terrace/patio | ☐ | ☐ | Loading Area | ☐ | ☐ |
| Restrooms | ☐ | ☐ | Trash Facilities | ☐ | ☐ |
| Stairs | ☐ | ☐ | Landscaping | ☐ | ☐ |
| Exterior windows | ☐ | ☐ | Other____________ | ☐ | ☐ |
| Security Alarm | ☐ | ☐ | Other____________ | ☐ | ☐ |

Any item not mentioned herein but existing on Property (other than furniture, fixtures and equipment of Tenant) shall be maintained by: *[Check one. The box not marked shall not be a part of this Agreement.]* ☐ Landlord **OR** ☐ Tenant

Copyright© 2023 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

Upon receipt of written notice from Tenant, Landlord shall, within a reasonable time period thereafter, repair all defects in those facilities and systems that are the responsibility of Landlord to maintain in good working order and repair. If Tenant does not promptly perform its maintenance and repair obligations as set forth herein, Landlord may make such repairs and/or replacements and Tenant shall promptly pay the costs of the same. Landlord shall not be liable to Tenant for any damage caused by any of the above referenced systems or facilities or by water coming through or around the roof or any door, flashing, skylight, vent, window, or the like in or about Property, except if such damage is due to the gross negligence or willful misconduct of Landlord. Tenant shall be responsible for the reasonable costs of repairs made necessary by the negligence or willful misconduct of Tenant (including Tenant's employees, agents, invitees, guests, or licensees).

7. **Services.** Landlord shall provide, at Landlord's expense the following services:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

- ☐ General cleaning and janitorial service of the interior of Property _______ times per week
- ☐ Concierge service as follows: ____________________
- ☐ Parking attendant as follows: ____________________
- ☐ Property monitor as follows: ____________________
- ☐ Trash collection service _______ times per week
- ☐ Soap, paper towels, and toilet tissue for rest rooms ________________ times per week
- ☐ Replacement of all light bulbs and repair and maintenance of all light fixtures located in the interior of Property.
- ☐ Other ____________________.

Landlord shall not be liable for the nonperformance or inadequate performance of such services by third parties. Tenant shall be responsible for the costs and provision of any services that Landlord has not expressly agreed to pay for in this Lease. Tenant agrees to provide services not provided by Landlord that are necessary to keep Property in good order, condition, and repair, normal wear and tear excepted. If Tenant does not provide such services, Landlord may then provide such services and Tenant shall promptly pay Landlord the costs for such services.

8. **Utilities.** The services and/or utilities set forth below serving Property shall be paid by either the Landlord or Tenant as follows:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

| UTILITY | TENANT | LANDLORD | UTILITY | TENANT | LANDLORD |
|---|---|---|---|---|---|
| Water | ☐ | ☐ | Sewer | ☐ | ☐ |
| Electricity | ☐ | ☐ | Natural Gas | ☐ | ☐ |
| Garbage | ☐ | ☐ | Cable Television | ☐ | ☐ |
| Telephone | ☐ | ☐ | Digital Subscriber Line | ☐ | ☐ |
| Other _________ | ☐ | ☐ | Other _____________ | ☐ | ☐ |

Tenant shall be responsible for the costs of any utilities that Landlord has not expressly agreed to pay for in this Lease. Tenant must provide proof of payment of final bills for all utilities or service termination (cutoff) slips. Landlord may, at Landlord's option, pay utilities and be reimbursed by Tenant along with the next month's rent. Landlord shall not be liable for any interruptions or delays in the provision of utility services unless such interruptions or delays shall be caused by Landlord's gross negligence or willful misconduct.

9. **Renewal Term.** Either party may terminate this Lease at the end of the term by giving the other party sixty (60) days written notice prior to the end of the term. If neither party gives notice of termination, the Lease will automatically be extended on a month-to-month basis with all terms remaining the same except that Landlord reserves the right to increase the amount of rent upon delivery of written notice to Tenant sixty (60) days prior to the effective date of any increase. Thereafter, Tenant may terminate this Lease upon sixty (60) days written notice to Landlord and Landlord may terminate this Lease upon sixty (60) days written notice to Tenant.

10. **Sublet and Assignment.** Tenant may not sublet Property in whole or in part or assign this Lease without the prior written consent of Landlord. This Lease shall create the relationship of Landlord and Tenant between the parties hereto; no estate shall pass out of Landlord and this Lease shall create a usufruct only. In the event Landlord shall assign this Lease, the assignee thereof shall be responsible to timely pay Brokers all commissions and other sums owed to them hereunder.

11. **Right of Access, Signage.**

A. Landlord and Landlord's agents shall have the right of access to Property for inspection, repairs and maintenance during reasonable hours. In the case of emergency, Landlord may enter Property at any time to protect life and prevent damage to Property. Landlord and/or Landlord's agents may place a "for rent" or "for sale" sign on the interior or exterior of Property, and may show Property to prospective tenants or purchasers during reasonable hours. Tenant agrees to cooperate with Landlord, Landlord's agent and Brokers who may show Property to prospective Tenants. Tenant shall secure valuables and agrees to hold Landlord and/or Landlord's Agent harmless for any loss thereof. For each occasion where the access rights described above are denied, Tenant shall pay Landlord the sum of $ 100.00 as liquidated damages; it being acknowledged that Landlord shall be damaged by the denial of access, that Landlord's actual damages are hard to estimate, and that the above amount represents a reasonable pre-estimate of Landlord's damages rather than a penalty.

B. Without Landlord's prior written permission, Tenant shall not place any sign, advertising matter, or any other things of any kind on any part of the outside walls or roof of Property or on any part of the interior of Property that is visible from the exterior of Property. Tenant shall maintain all such permitted signs, advertising matter, or any other things of any kind in good condition and repair. Tenant agrees to remove at its cost all such permitted signs, advertising matter, or any other things of any kind at the end of this Lease.

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

12. Use. Property shall only be used for the purposes set out as follows: ______________________________

Property shall be used so as to comply with all federal, state, county, and municipal laws and ordinances and any applicable rules and regulations. Tenant shall not use or permit Property to be used for any disorderly or unlawful purpose; nor shall Tenant engage in any activity on Property which would endanger the health and safety of other Tenants or which otherwise creates a nuisance.

13. Agency and Brokerage.

A. **Agency Disclosure:** In this Agreement, the term "Broker" shall mean a licensed Georgia real estate broker or brokerage firm and, where the context would indicate, the broker's affiliated licensees. No Broker in this transaction shall owe any duty to Landlord or Tenant greater than what is set forth in their brokerage engagements and the Brokerage Relationships in Real Estate Transactions Act, O.C.G.A. § 10-6A-1 et. seq.;

1. **No Agency Relationship:** Landlord and Tenant acknowledge that, if they are not represented by a Broker, they are each solely responsible for protecting their own interests, and that Broker's role is limited to performing ministerial acts for that party.
2. **Listing Broker.** Broker working with the Landlord is identified on the signature page as the "Listing Broker"; and said Broker ☐ is **OR** ☐ is not representing Landlord;
3. **Leasing Broker:** Broker working with Tenant (including in transactions where Broker is representing Landlord) is identified on the signature page as "Leasing Broker;" and said Broker ☐ is **OR** ☐ is not representing Tenant; and
4. **Dual Agency or Designated Agency:** If Landlord and Tenant are both being represented by the same Broker, a relationship of either ☐ designated agency **OR** ☒ dual agency shall exist.

a. **Dual Agency Disclosure:** *[Applicable only if dual agency has been selected above.]*
Tenant and Landlord are aware that Broker is acting as a dual agent in this transaction and consent to the same. Tenant and Landlord have been advised that:
(1) In serving as a dual agent, Broker is representing two clients whose interests are or at times could be different or even adverse;
(2) Broker will disclose all adverse, material facts relevant to the transaction and actually known to the dual agent to all parties in the transaction except for information made confidential by request or instructions from each client which is not otherwise required to be disclosed by law;
(3) Tenant and Landlord do not have to consent to dual agency and, the consent of Tenant and Landlord to dual agency has been given voluntarily and the parties have read and understand their brokerage engagement agreements.
(4) Notwithstanding any provision to the contrary contained herein, Tenant and Landlord each hereby direct Broker, while acting as a dual agent, to keep confidential and not reveal to the other party any information which could materially and adversely affect their negotiating position.

b. **Designated Agency Assignment:** *[Applicable only if the designated agency has been selected above.]*
Broker has assigned ______Laura Beth Davis______ to work exclusively with Tenant as Tenant's designated agent and ______Mark Brewster______ to work exclusively with Owner/Landlord as Owner/Landlord's designated agent. Each designated agent shall exclusively represent the party to whom each has been assigned as a client and shall not represent in this transaction the client assigned to the other designated agent.

B. **Material Relationship Disclosure:** The Broker and/or affiliated licensees have no material relationship with either client except as follows: Mark Brewster is part owner and leasing broker.
(A material relationship means one actually known of a personal, familial or business nature between the Broker and/or affiliated licensees and a client which would impair their ability to exercise fair judgment relative to another client.)

C. **Brokerage:** The Brokers listed below have performed a valuable service in this transaction and are made parties hereunder to enforce their commission rights. Payment of commission to a Broker shall not create an agency or subagency relationship between Leasing Broker and either Landlord or Landlord's Broker. Landlord agrees to pay the Broker listed below and representing Landlord to lease and/or manage Property ("Listing Broker") a commission (which commission has already been negotiated in a separate agreement) of *[Check one. The section not marked shall not be a part of this Agreement]*:

☐ $______________ or _______ percent (%) of the total base rent to be paid under the Lease, which shall be due and payable upon occupancy.

☒ $______________ or ___7___ percent (%) of base rents paid, which shall be due and payable upon Tenant's monthly payment of rent in the manner provided in the Rent Paragraph above.

In the event the Lease is made in cooperation with another Broker listed below as the Leasing Broker, the Listing Broker shall receive ___Six___ percent (%) of the total real estate commission paid hereunder and the Leasing Broker shall receive ___1___ percent (%) of the total real estate commission paid hereunder. In the event Tenant and/or Landlord fail or refuse to perform any of their obligations herein, the non-performing party shall immediately pay the Listing Broker and the Leasing Broker their full commissions. The Listing Broker and Leasing Broker may jointly or independently pursue the non-performing party for that portion of the commission, which they would have otherwise received under the Lease.

14. Default. If Tenant defaults under this Lease, Landlord shall have the right to pursue any or all of its remedies under Georgia Law. A default shall include, but not be limited to, the failure of Tenant to pay Landlord rent or reimburse Landlord for damages, repairs or costs when due, the abandonment of the Property by Tenant (which shall include the discontinuance of the use of the Property by Tenant) and the failure of Tenant to comply with any of the terms of the Lease including any rules and regulations. Landlord shall give Tenant a ten (10) day notice of and opportunity to cure any non-monetary breach of this Lease. All remedies hereunder shall be cumulative and not concurrent. Tenant shall remain liable for rents from and after any action by Landlord under a proceeding against Tenant for holding over or distress warrant, whether or not Tenant retains the right to possession of Property.

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

15. Rules and Regulations.

A. Tenant is prohibited from adding, changing or in any way altering locks installed on the doors of Property without prior written permission of Landlord. If all keys to Property are not returned when Tenant vacates Property, Landlord may charge a re-key charge in the amount of $ N/A.

B. ~~Motor vehicles with expired or missing license plates, non-operative vehicles, boats, trailers, RVs and campers are not permitted on Property. Any such vehicle may be removed by Landlord at the expense of Tenant, for storage or for public or private sale, at Landlord's option, and Tenant shall have no right or recourse against Landlord thereafter.~~ WB

C. No goods or materials of any kind or description, which are combustible or would increase fire risk shall be kept in or placed on Property (except for goods and materials typically found in a general office use provided that the same are limited in quantity to that normally found in such use).

D. ~~No nails, screws or adhesive hangers except standard picture hooks, shade brackets and curtain rod brackets may be placed in walls, woodwork or any part of Property.~~ WB

E. Tenant shall not place any objects or personal property on Property in a manner that is inconsistent with the load limits of Property. Tenant shall consult Landlord before placing any heavy furniture, file cabinets, or other equipment in Property.

F. ~~Landlord shall provide heating and air conditioning to Property between ___ a.m. and ___ p.m., Monday to Friday (excluding public holidays); between ___ a.m. and ___ p.m., Saturday; and between ___ a.m. and ___ p.m., Sunday. Tenant shall notify Landlord by 4 p.m. of the preceding day of any requests for overtime heating and air conditioning. Landlord may charge Tenant its reasonable costs of providing such overtime heating and air conditioning.~~ WB

G. Tenant shall not, without Landlord's prior written consent, use any equipment which uses electric current in excess of 110 volts, which will increase the amount of electricity ordinarily furnished for use of Property as general office space, or which require clean circuits or other distribution circuits.

H. Landlord may establish additional reasonable Rules and Regulations concerning the maintenance, use, and operation of Property. Amendments and additions to the Rules and Regulations shall be effective upon delivery of a copy thereof to Tenant.

16. Abandonment. If Tenant removes or attempts to remove personal property from Property other than in the usual course of continuing occupancy, without having first paid Landlord all monies due, Property may be considered abandoned, and Landlord shall have the right, without notice, to store or dispose of any personal property left on Property by Tenant. Landlord shall also have the right to store or dispose of any of Tenant's personal property remaining on Property after the termination of this Lease. Any such personal property shall become Landlord's personal property.

17. Estoppel Certificate. Tenant shall, from time to time, upon Landlord's request execute, acknowledge, and deliver to Landlord, within ten days of such request, a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or if there has been modification thereof, that the same is in full force and effect as modified and stating the nature thereof); (b) that to the best of its knowledge there are no uncured defects on the part of the Landlord (or if any such defaults exist, a specific description thereof); (c) the date to which any rents or other charges have been paid in advance; and (d) any other reasonable matters requested by Landlord. Landlord and any prospective purchaser or transferee of Landlord's interest hereunder or any then existing or prospective mortgagee or grantee of any deed to secure debt may rely on such certificates.

18. Property Loss. Storage of personal property by Tenant shall be at Tenant's risk and Landlord shall not be responsible for any loss or damage. Tenant shall be responsible to insure Tenant's personal property against loss or damage. Landlord shall not be responsible or any damage to Tenant's property, unless such damage is caused by Landlord's gross negligence or willful misconduct.

19. Destruction of Property.

A. If earthquake, fire, storm, or other casualty shall totally destroy (or so substantially damage as to be untenable) Property, rent shall abate from the date of such destruction. Landlord shall have sixty (60) days to commence the restoration of Property to a tenable condition. If in Landlord's sole discretion restoration cannot be completed within 180 days following such destruction, Landlord may, by written notice furnished to Tenant within thirty (30) days of such destruction, terminate this Lease, whereupon rent and all other obligations hereunder shall be adjusted between the parties as of date of such destruction. In the event the Landlord elects to complete such restoration, but fails to do so within 180 days following such destruction, this Lease may be terminated as of the date of such destruction upon written notice from either party to the other given not more than ten (10) days following expiration of said 180 day period. If such notice is not given, then this Lease shall remain in force and rent shall commence upon delivery of Property to Tenant in a tenable condition.

B. If Property is damaged but not rendered wholly untenable by earthquake, fire, storm, or other casualty, rent shall abate in such proportion as Property have been damaged and Landlord shall restore Property as reasonably quickly as practicable whereupon full rent shall commence.

C. Rent shall not abate nor shall Tenant be entitled to terminate this Lease if the damage or destruction of Property, whether total or partial, is the result of the negligence of Tenants, its contractors, employees, agents, invitees, guests, or licensees.

20. Alteration and Improvements. Tenant shall not make or allow to be made any alterations, physical additions, or improvements in or to Property without first obtaining Landlord's prior written consent. Landlord may grant or withhold such consent within its reasonable discretion and may impose reasonable conditions upon its consent. All costs of any such alteration, addition, or improvement shall be borne by Tenant, unless otherwise agreed in writing. The provisions of the Work Letter, attached hereto as an Exhibit and a part of this Lease, shall govern any alterations or improvements to be performed prior to the Commencement Date of this Lease.

Copyright© 2023 by Georgia Association of REALTORS®, Inc.


TRANSACTIONS

21. **Insurance.** Tenant agrees that during the term of the Lease, Tenant will carry and maintain, at its sole cost, the following types of insurance, in the amounts specified and in the form hereinafter provided for:
*[Check all that apply. The sections not marked shall not be a part of this Agreement.]*

☒ A. **General Commercial Liability Insurance (or reasonable equivalent thereto):** Such insurance shall cover Property and Tenant's use thereof against claims for personal injury, bodily injury or death, property damage and products liability occurring upon, in, or about Property. The limits of such policy shall be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Such insurance shall be endorsed to cover independent contractors and contractual liability. Such insurance shall extend to any liability of Tenant arising out of the indemnities provided for in this Lease.

☒ B. **Fire and Extended Coverage Insurance (or reasonable equivalent thereto):** Such insurance shall cover Tenant's interest in its improvements to Property, and all furniture, equipment, supplies, and other property owned, leased, held or possessed by it and contained therein. Such insurance shall coverage shall be in an amount equal to not less than 500000 percent (%) of full replacement cost as updated from time to time during the term of the Lease. Tenant shall promptly provide Landlord written notice in the event of any damages to persons or property occurring on Property from fire, accident, or any other casualty.

☒ C. **Workers' Compensation Insurance (or reasonable equivalent thereto):** Such insurance shall include coverage as required by applicable law.

☒ D. **Contractors Insurance (or reasonable equivalent thereto):** If Tenant engages any contractor or subcontractor to construct improvements or perform any other work on Property, Tenant shall require that such contractor or subcontractor have in force commercial general liability insurance, including personal injury coverage, contractual liability coverage, completed operations coverage, property damage endorsement, and, for any work which is subcontracted, contractors' protective liability coverage, insuring against any and all liability for injury to or death of a person or persons and for damage to property occasioned by or arising out of such work. The limits of such policy for both damage to property and bodily injury to be in such amounts as Landlord may from time to time reasonably require, but in any event not less than One Million Dollars ($ 1,000,000.00 ) for each occurrence. Any such contractor or subcontractor shall also be required to maintain workers' compensation insurance as required by applicable law. All insurance policies procured and maintained herein (other than workers' compensation insurance) shall name Landlord, Landlord's property manager(s), Landlord's broker(s) and Landlord's lender as additional insureds, shall be carried with insurance companies licensed to do business in the State of Georgia and having a current financial strength rating in Best's Ratings of not less than B+. Such policies shall be non-cancellable and may not be materially altered except after thirty (30) days notice to Landlord. Such insurance policies or, at Landlord's election, duly executed certificates of such policies, accompanied by proof of the premium for such insurance, shall be delivered to Landlord before the earlier of (a) the initial entry by Landlord upon Property for the installation of its equipment or improvements; or (b) the Commencement Date of the Lease. Certificates of renewal of such insurance or copies of any replacement insurance policies, accompanied by proof of payment of the premiums for such insurance, shall be delivered to Landlord at least ten (10) days before the expiration of each respective policy term. Tenant shall comply with all rules and regulations applicable to Property issued by the Board of Fire Underwriters or by any body hereinafter constituted exercising similar functions. Tenant shall not intentionally do anything, or permit anything to be done, on or about Property that might adversely affect, contravene, or impair any policies of insurance that are in force for Property or any part thereof. Tenant shall pay all costs, damages, expenses, claims, fines, or penalties incurred by Landlord or Tenant because of Tenant's failure to comply with this Paragraph. Tenant indemnifies Landlord from all liability with reference thereto.

22. **Taxes.** Tenant shall pay any and all taxes (including assessments and license fees) assessed or imposed upon Tenant's fixtures, furniture, appliances, and personal property located in Property: *[Check one. The section not marked shall not be a part of Agreement.]*

☒ A. **Landlord Pays All Property Taxes:** Landlord shall pay all property taxes levied against Property. Tenant shall not pay any property taxes levied against Property.

☐ B. **Tenant Pays Increases in Property Taxes:** In addition to other rent payments specified in this Lease, Tenant shall pay as additional rent the amount by which all property taxes on Property for each tax year exceed taxes on Property for the tax year ________. On or before the first day of the term of this Lease, Landlord will provide Tenant written notice of Landlord's estimate of the additional rent payable under this subparagraph. During December of each calendar year or as soon as practicable, Landlord will give Tenant written notice of its estimate of the payments to be made for the ensuing calendar year. On the first day of each month during the term of the Lease, Tenant will pay one-twelfth of the estimated amount in the manner provided in the Rent Paragraph. If notice is not given in December, Tenant will continue to pay on the basis of the prior year's estimate until the month after the notice is given. Within 90 (ninety) days after the close of each calendar year or as soon as practicable thereafter, Landlord will deliver to Tenant: (1) a statement of property taxes for the calendar year certified by certified public accountants designated by Landlord; and (2) a statement of the payments made or to be made for the calendar year that has been prepared on the basis of the certified statement. If on the basis of those statements, Tenant owes an amount that is less than the estimated payments for the calendar year previously made by the Tenant, Landlord will pay Tenant the amount of the overpayment within thirty (30) days after delivery of those statements. If on the basis of those statements Tenant owes an amount that is more than the estimated payments for such calendar year previously made by Tenant, Tenant will pay the deficiency to Landlord within thirty (30) days after delivery of those statements. If the Lease commences on a day other than the first day of the calendar year or ends on a day other than the last day of a calendar year, the amounts payable under this subparagraph shall be prorated.

23. **Sale of Property to Tenant.** Landlord shall pay Leasing Broker a commission in the amount of 7 percent (%) and Listing Broker a commission in the amount of _______ percent (%) of the gross sales price at closing if Tenant acquires from Landlord title to Property or any part thereof or any property as an addition, expansion, or substitution for Property during the term of this Lease, any renewals thereof, or within one year after the expiration of this Lease. Such commission shall be payable in lieu of any further commission which otherwise Broker would have been due under this Lease. Notwithstanding the above, Owner shall immediately give notice to Broker if and when: (a) Owner enters into a contract to sell Property; or (b) Owner closes on the sale of Property to another.

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

24. **Condemnation.** If all or any part of Property are taken or appropriated by any public or quasi-public authority under the power of eminent domain, and if the remaining portion of Property is thereby rendered untenable or unusable for the purposes herein stated, this Lease shall terminate when the condemning authority takes possession, and any rent paid for any period beyond possession by the condemning authority shall be repaid to Tenant. Landlord shall receive the entire condemnation award without deduction there from for any interest of Tenant in Property, but Tenant shall have the right to make a separate claim with the condemning authority for, and to receive therefore, (a) any moving expenses incurred by Tenant as a result of such condemnation; (b) any costs incurred or paid by Tenant in connection with any alteration or improvement made by Tenant to Property; (c) the value of Tenant's personal property taken; (d) Tenant's loss of business income; and (e) any other separate claim which Tenant may be permitted to make under applicable law, provided that such other separate claims shall not reduce or adversely affect the amount of Landlord's award.

25. **Disclaimer.** Tenant and Landlord acknowledge that they have not relied upon any advice, representations or statements of Brokers and waive and shall not assert any claims against Brokers involving the same. Tenant and Landlord agree that Brokers shall not be responsible to advise Tenant on any matter including but not limited to the following: any matter which could have been revealed through a survey, title search or inspection of Property; the condition of Property, any portion thereof, or any item therein; building products and construction techniques; the necessity or cost of any repairs to Property; mold; hazardous or toxic materials or substances; termites and other wood destroying organisms; the tax or legal consequences of this transaction; the availability and cost of utilities or community amenities; the appraised or future value of Property; any condition(s) existing off Property which may affect Property; the terms, conditions and availability of financing; and the uses and zoning of Property whether permitted or proposed. Tenant acknowledges that Broker is not an expert with respect to the above matters and that, if any of these matters or any other matters are of concern, Tenant should seek independent expert advice relative thereto. Tenant acknowledges that Broker shall not be responsible to monitor or supervise any portion of any construction or repairs to Property and that such tasks clearly fall outside the scope of real estate brokerage services.

26. **Other Provisions.**

A. **Time of Essence:** Time is of the essence of this Lease.

B. **No Waiver:** Any failure of Landlord to insist upon the strict and prompt performance of any covenants or conditions of this Lease or any of the rules and regulations set forth herein shall not operate as a waiver of any such violation or of Landlord's right to insist on prompt compliance in the future of such covenant or condition, and shall not prevent a subsequent action by Landlord for any such violation. No provision, covenant or condition of this Lease may be waived by Landlord unless such waiver is in writing and signed by Landlord.

C. **Definitions:** "Landlord" as used in this Lease shall include its representatives, heirs, agents, assigns, and successors in title to Property. Broker shall be considered the authorized agent of Landlord except to the extent specifically provided for herein. The terms "Landlord" and "Tenant" shall include singular and plural, and corporations, partnerships, companies or individuals, as may fit the particular circumstances. The term "Binding Agreement Date" shall mean the date that this Lease has been signed by the Tenant and Landlord and a fully signed and executed copy thereof has been returned to the party making the offer to lease. "Property taxes" means any form of real or personal property taxes, assessments, special assessments, fees, charges, levies, penalties, service payments in lieu of taxes, excises, assessments, and charges for transit, housing, or any other purposes, impositions or taxes of every kind and nature whatsoever, assessed or levied by any authority having the power to tax against Property or any legal or equitable interest of Landlord in Property, whether imposed now or in the future, excepting only taxes measured by the net income of Landlord from all sources.

D. **Entire Agreement:** This Lease and any attached addenda and exhibits thereto shall constitute the entire Agreement between the parties and no verbal statement, promise, inducement or amendment not reduced to writing and signed by both parties shall be binding.

E. **Attorney's Fees and Costs of Collection:** Whenever any sums due hereunder are collected by law, or by attorney at law to prosecute such an action, then both parties agree that the prevailing party will be entitled to reasonable attorney's fees, plus all costs of collection.

F. **Indemnification:** Tenant agrees to indemnify and hold Landlord and Broker harmless from and against any and all injuries, damages, losses, suits and claims against Landlord and/or Broker arising out of or related to: (1) Tenant's failure to fulfill any condition of this Lease; (2) any damage or injury happening in or to the Premises and the Property or to any improvements thereon as a result of the acts or omissions of Tenant or Tenant's family members, invitees or licensees; (3) Tenant's failure to comply with local, state or federal law; (4) any judgment, lien or other encumbrance filed against the Premises or Property as a result of Tenant's actions and any damage or injury happening in or about the Premises or Property to Tenant or Tenant's family members, invitees or licensees (except if such damage or injury is caused by the intentional wrongful acts of Landlord or Broker); (5) failure to maintain or repair equipment or fixtures, where the party responsible for their maintenance uses commercially reasonable efforts to make the necessary repairs and Tenant covenants not to sue Landlord or Broker with respect to any of the above-referenced matters. In addition to the above Tenant agrees to hold Broker harmless from and against Owner of the Property not paying or keeping current with any mortgage, property taxes or home owners association fee's on the Property or not fulfilling the Owner's obligations under this lease. For the purpose of this paragraph, the term "Broker" shall include Broker and Broker's affiliated licensees, employees and if Broker is a licensed real estate brokerage firm, then officers, directors and owners of said firm.

G. **No Partnership:** Tenant by execution of this Lease is not a partner of Landlord in the conduct of its business or otherwise, or joint venturer, or a member of any joint enterprise with Landlord.

H. **No Recordation:** Tenant shall not record this Lease nor any short form memorandum thereof without Landlord's prior written consent.

I. **Notices:**

(1) **Generally:** All notices given hereunder shall be in writing, legible and signed by the party giving the notice. In the event of a dispute regarding notice, the burden shall be on the party giving notice to prove delivery. The requirements of this notice paragraph shall apply even prior to this Agreement becoming binding. Notices shall only be delivered: (1) in person; (2) by courier, overnight delivery service or by certified or registered U.S. mail (hereinafter collectively "Delivery Service"); or (3) by e-mail or facsimile. The person delivering or sending the written notice signed by a party may be someone other than that party.



TRANSACTIONS

(2) **Delivery of Notice:** A notice to a party shall be deemed to have been delivered and received upon the earliest of the following to occur: (1) the actual receipt of the written notice by a party; (2) in the case of delivery by a Delivery Service, when the written notice is delivered to an address of a party set forth herein (or subsequently provided by the party following the notice provisions herein), provided that a record of the delivery is created; (3) in the case of delivery electronically, on the date and time the written notice is electronically sent to an e-mail address or facsimile number of a party herein (or subsequently provided by the party following the notice provisions herein) even if it is not opened by the recipient. Notice to a party shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the party set forth herein (or subsequently provided by the party following the notice provisions herein).

(3) **When Broker Is Authorized to Accept Notice for Client:** Except where the Broker is acting in a dual agency capacity, the Broker and any affiliated licensee of the Broker representing a party in a client relationship shall be authorized agents of the party for the limited purpose of receiving notice and such notice to any of them shall for all purposes herein be deemed to be notice to the party. Notice to an authorized agent shall not be effective unless the written notice is sent to an address, facsimile number or e-mail address of the authorized agent set forth herein (or subsequently provided by the authorized agent following the notice provisions herein) even if it is not opened by the recipient. Except as provided for herein, the Broker's staff at a physical address set forth herein of the Broker or the Broker's affiliated licensees are authorized to receive notices delivered by a Delivery Service. The Broker, the Broker's staff and the affiliated licensees of the Broker shall not be authorized to receive notice on behalf of a party in any transaction in which a brokerage engagement has not been entered into with the party or in which the Broker is acting in a dual agency capacity. In the event the Broker is practicing designated agency, only the designated agent of a client shall be an authorized agent of the client for the purposes of receiving notice.

J. **Governing Law and Interpretation:** This Agreement may be signed in multiple counterparts each of which shall be deemed to be an original and shall be interpreted in accordance with the laws of Georgia. No provision herein, by virtue of the party who drafted it, shall be interpreted less favorably against one party than another. All references to time shall mean the time in Georgia. If any provision herein is held to be unenforceable, it shall be severed from this Agreement while the remainder of the Agreement shall, to the fullest extent permitted by law, continue to have full force and effect as a binding contract.

27. **GAR Forms**: The Georgia Association of REALTORS®, Inc. ("GAR") issues certain standard real estate forms. These GAR forms are frequently provided to the parties in real estate transactions. No party is required to use any GAR form. Since these forms are generic and written with the interests of multiple parties in mind, they may need to be modified to meet the specific needs of the parties using them. If any party has any questions about his or her rights and obligations under any GAR form, he or she should consult an attorney. Provisions in the GAR Forms are subject to differing interpretations by our courts other than what the parties may have intended. At times, our courts may strike down or not enforce provisions in our GAR Forms, as written. No representation is made that the GAR Forms will protect the interests of any particular party or will be fit for any specific purpose. The parties hereto agree that the GAR forms may only be used in accordance with the licensing agreement of GAR. While GAR forms may be modified by the parties, no GAR form may be reproduced with sections removed, altered or modified unless the changes are visible on the form itself or in a stipulation, addendum, exhibit or amendment thereto.

28. **Beware of Cyber Fraud**: Fraudulent e-mails attempting to get you to wire money to criminal computer hackers are increasingly common in real estate transactions. Under this scam, computer hackers fraudulently assume the online identity of the actual mortgage lender, closing attorney and/or real estate broker with whom you are working in the real estate transaction. Posing as a legitimate company, they then direct you to wire money to them. In many cases, the fraudulent e-mail is sent from what appears to be the authentic web page of the legitimate company responsible for sending the wiring instructions. You should use great caution in sending or receiving funds based solely on wiring instructions sent to you by e-mail. Independently verifying the wiring instructions with someone from the company sending them is the best way to prevent fraud. In particular, you should treat as highly suspect any follow up e-mails you receive from a mortgage lender, closing attorney and/or real estate broker directing you to wire funds to a revised account number. Never verify wiring instructions by calling a telephone number provided along with a second set of wiring instructions since you may end up receiving a fraudulent verification from the computer hackers trying to steal your money. Independently look up the telephone number of the company who is supposed to be sending you the wiring instructions to make sure you have the right one.

29. **Exhibits**. All exhibits attached hereto, listed below or referenced herein are made a part of this Lease. If any such exhibit conflicts with any preceding paragraph, said exhibit shall control:

☐ Exhibit "A" Legal Description
☐ Other ______________________.
☐ Other ______________________.

**SPECIAL STIPULATIONS:** The following Special Stipulations, if conflicting with any exhibits or preceding paragraph, shall control.

1) 405 John Davenport leased "AS-IS"; no warranties

☐ **Additional Special Stipulations (F246) are attached.**

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

By signing this Agreement, Tenant and Landlord acknowledge that they have each read and understood this Agreement and agree to its terms.

1 Tenant's Signature

Wain Enterprises, LLC dba Wheeler's
Print or Type Name

4/3/23
Date

scott.morris@wheelers.com
Tenant's E-mail Address

Scott Morris
2 Tenant's Signature

dba Wheeler's
Print or Type Name

Date

Tenant's E-mail Address

☐ Additional Signature Page (F931) is attached.

1 Landlord's Signature

Mark Brewster for Fairbanks Co.
Print or Type Name

Date

Landlord's E-mail Address

2 Landlord's Signature

Print or Type Name

Date

Landlord's E-mail Address

☐ Additional Signature Page (F931) is attached.

**Leasing Broker/Affiliated Licensee Contact Information**

Garden Lakes Realty
Leasing Broker

Broker/Affiliated Licensee Signature

Laura Beth Davis
Print or Type Name

GA Real Estate License #

Licensee's Phone Number

Fax Number

Licensee's E-mail Address

REALTOR® Membership

Broker's Address

706.234.9421
Broker's Phone Number

Fax Number

GLRC01
MLS Office Code

33954
Brokerage Firm License Number

Multiple Listing Number

**Listing Broker/Affiliated Licensee Contact Information**

Garden Lakes Realty
Listing Broker

Broker/Affiliated Licensee Signature

Mark Brewster
Print or Type Name

215869
GA Real Estate License #

706-346-7553
Licensee's Phone Number

Fax Number

brewster@gardenlakesrealty.com
Licensee's Email Address

REALTOR® Membership

Broker's Address

Broker's Phone Number

Fax Number

GLRC01
MLS Office Code

33954
Brokerage Firm License Number

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

Exhibit A – Legal Description of Property

405 John Davenport Drive, NW Rome 30165

N/A

PART OF I13Z031

_______________ Tenant's Initials

_______________ Landlord's Initials

Copyright© 2023 by Georgia Association of REALTORS®, Inc.

**EXHIBIT "E"**

Garden Lakes
REALTY COMPANY

-LEASE AMENDMENT-

Re: 401 John Davenport Drive, NW
403 John Davenport Drive, NW
405 John Davenport Drive, NW
Rome, GA 30165

11/26/2025

1) The individual leases for each of the above-named properties are hereby combined into one lease starting 12/1/2025.
2) The lease for these properties is hereby extended for 49 months, starting 12/1/2025 and running through 12/31/29.
3) The new rental rate for these properties will be $14,986 for the following 49 months.
4) Tenant has the option to renew this lease for an additional 48 months by giving Landlord written notice within 90 days of the expiration of the lease, 12/31/29. Landlord shall notify Tenant prior to 12 months of lease expiration with any intention to not continue lease. The rental rate for the additional 48 months will be $14,986 + the difference in the CPI from September 2025, as published by the Bureau of Labor Statistics. CPI-W
5) All other lease terms/commitments including the purchase option for the 3.46 acres and 3 buildings remain the same. TM

AGREED:

James T. Maniz, CEO
James T. Maniz
Wain Enterprises, LLC

Mark Brewster for Landlord
Fairbanks Properties, LLC
Garden Lakes Realty Co., LLC

**EXHIBIT "F"**

401/403/405 John Davenport Drive

| Month | Base rent due | Late charge | Payments received | Month-end balance |
|---|---|---|---|---|
| Dec 2025 | $14,986.00 | $1,080.00 | $0.00 | $16,066.00 |
| Jan 2026 | $14,986.00 | $1,080.00 | $27,600.00 | $4,532.00 |
| Feb 2026 | $14,986.00 | $1,080.00 | $13,800.00 | $6,798.00 |
| Mar 2026 | $14,986.00 | — (paid in full) | $17,390.00 | $4,394.00 |
| Apr 2026 | $14,986.00 | $1,080.00 | $0.00 | $20,460.00 |
| May 2026 | $14,986.00 | $1,080.00 | $0.00 | $36,526.00 |
| Jun 2026 | $14,986.00 | $1,080.00 | $14,986.00 | $37,606.00 |
| Jul 2026 | $14,986.00 | $1,080.00 | $0.00 | $53,672.00 |
| Aug 2026 | $14,986.00 | $1,080.00 | $14,986.00 | $54,752.00 |
| **Totals** | **$134,874.00** | **$8,640.00** | **$88,762.00** | **$54,752.00** |

**EXHIBIT "G"**

# 499 John Davenport Drive

| Month | Base rent due | Late charge | Payments received | Month-end balance |
|---|---|---|---|---|
| Feb 2025 | $25,405.00 | — | $25,405.00 | $0.00 |
| Mar 2025 | $25,405.00 | $2,540.00 | $25,405.00 | $2,540.00 |
| Apr 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| May 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| Jun 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| Jul 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| Aug 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| Sep 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| Oct 2025 | $25,405.00 | — | $25,405.00 | $2,540.00 |
| Nov 2025 | $25,405.00 | — | $37,405.00 | ($9,460.00) |
| Dec 2025 | $25,405.00 | $2,540.00 | $0.00 | $18,485.00 |
| Jan 2026 | $25,405.00 | $2,540.00 | $50,810.00 | ($4,380.00) |
| Feb 2026 | $25,405.00 | $2,540.00 | $25,405.00 | ($1,840.00) |
| Mar 2026 | $25,405.00 | — | $25,405.00 | ($1,840.00) |
| Apr 2026 | $25,405.00 | $2,540.00 | $0.00 | $26,105.00 |
| May 2026 | $25,405.00 | $2,540.00 | $0.00 | $54,050.00 |
| Jun 2026 | $25,405.00 | $2,540.00 | $25,405.00 | $56,590.00 |
| Jul 2026 | $25,405.00 | $2,540.00 | $0.00 | $84,535.00 |
| Aug 2026 | $25,405.00 | $2,540.00 | $25,405.00 | $87,075.00 |
| **Totals** | **$482,695.00** | **$22,860.00** | **$418,480.00** | **$87,075.00** |